2010 UT App 108

**Richard GARDINER, Plaintiff and Appellee,**

v.

**William YORK, Defendant and Appellant.**

**No. 20090562–CA.**

Court of Appeals of Utah.

April 29, 2010.

---

See also 153 P.3d 791.

William York, Delta, Appellant Pro Se.

James K. Slavens, Fillmore, for Appellee.

Before Judges DAVIS, McHUGH, and VOROS.

## OPINION

McHUGH, Associate Presiding Judge:

¶ 1 William York appeals from two trial court orders. The first order denied York's motion to set aside the court's 2008 ruling that York had violated the Wrongful Lien Act, *see* Utah Code Ann. § 38–9–7 (2005).[1] The second order sentenced York to two days in jail for contempt and declared York a "vexatious litigant" subject to restrictions on his ability to file pleadings with the court. We affirm the denial of York's motion to set aside, and we reverse and remand to the trial court for further proceedings consistent with this opinion respecting the sanctions for contempt and the filing restrictions.

---

1. Except as otherwise indicated, we cite to the current version of the Utah Code throughout this opinion for the reader's convenience.

## BACKGROUND

¶ 2 This appeal constitutes the latest episode in nearly a decade of litigation involving these parties. In early August of 2000, Richard Gardiner served Interport, Inc. with a summons and complaint alleging breach of contract, filed in Virginia. *See Gardiner v. York (York III)*, 2006 UT App 496, ¶ 3, 153 P.3d 791; *Gardiner v. York (York I)*, 2006 UT App 433U, para. 5, 2006 WL 2979447 (mem.) (per curiam). Almost immediately, York, acting as Interport's president, transferred title to a warehouse in Delta, Utah, to his parents, Betty York and William York Sr.[2] *See York III*, 2006 UT App 496, ¶ 3, 153 P.3d 791. At the conclusion of the breach of contract action, the Virginia court entered judgment against Interport in the amount of $7182. *See id.* ¶ 2. Gardiner domesticated that judgment in Utah and then filed a petition with the Utah court, claiming that the transfer to William York Sr. and Betty York was fraudulent. *See id.* ¶ 3. The trial court entered default judgment against Interport for failure to defend but held a bench trial with Betty York as the only remaining defendant.[3] *See id.* After hearing the evidence, the trial court found that York had fraudulently transferred the warehouse to his parents. *See York I*, 2006 UT App 433U, para. 1. We upheld that decision on appeal.[4] *See id.*

¶ 3 York next filed a lawsuit against Gardiner. The trial court dismissed York's action because it was not brought within the applicable statute of limitations, and we affirmed that decision on appeal. *See York v. Gardiner (York II)*, 2006 UT App 471U, para. 1, 2006 WL 3387261 (mem.) (per curiam). Two years after his action against Gardiner was dismissed, York filed a motion to set aside the judgment pursuant to rule 60(b) of the Utah Rules of Civil Procedure. *See York v. Gardiner (York IV)*, 2009 UT App 277U, paras. 1, 3, 2009 WL 3042388 (mem.) (per curiam). The trial court denied the motion as untimely; we again affirmed the trial court's decision on appeal. *See id.*

¶ 4 Despite the final, unfavorable resolution of the issues related to the fraudulent transfer of the warehouse and those related to York's claims against Gardiner, York refused to pay the Virginia judgment. Consequently, Gardiner prepared to enforce his judgment lien against the warehouse. In early 2008, Gardiner obtained a "Certified Foreclosure Report," which showed that in 2005, York had filed a $628,000 "Claim of Lien" against the warehouse. York alleged that the lien secured a similar amount owed to him by his parents.[5] On February 13, 2008, Gardiner sent a letter to York warning him that the lien was wrongful and demanding that it be removed. York refused to do so.

¶ 5 On March 24, 2008, Gardiner filed a wrongful lien action against York, which is the subject of this appeal. On April 1, 2008, Gardiner served York with a copy of the complaint and notice of a hearing set for April 3, 2008. York did not attend the April 3 hearing, instead indicating to Gardiner's attorney that he was entitled to twenty days to respond to the complaint and was, therefore, not required to attend. Upon being informed of York's position, the trial court found that Gardiner had provided York with sufficient notice of the hearing and that York's lien was wrongful. On April 21, 2008, the trial court entered a written order directing York to remove the wrongful lien and to

---

2. The warehouse was the company's only asset of value. *See Gardiner v. York (York I)*, 2006 UT App 433U, para. 5, 2006 WL 2979447 (mem.) (per curiam).

3. William York Sr. died before the fraudulent transfer action and was no longer a party. *See Gardiner v. York (York III)*, 2006 UT App 496, ¶ 3 n. 1, 153 P.3d 791.

4. Gardiner then filed a motion for reimbursement of the attorney fees he incurred in the suit against Betty York, but the trial court declined to award fees. *See York III*, 2006 UT App 496, ¶ 6, 153 P.3d 791. On appeal, we reversed and remanded to the trial court for a "determination of whether the attorney fees Gardiner incurred in pursuing the fraudulent transfer action were a reasonably foreseeable consequence of Interport's breach." *Id.* ¶ 17.

5. York's claim that his parents owed him substantial sums of money is directly contrary to his assertion in the fraudulent transfer action that he transferred the warehouse to his parents in repayment of significant amounts he owed to them.

pay damages and attorney fees to Gardiner. York did not appeal that order.

¶ 6 Before the wrongful lien order was entered, York filed a motion to dismiss Gardiner's complaint. York's motion was rife with inappropriate material, including accusations that opposing counsel had acted fraudulently; statements that the trial judge had not "taken the time to learn ... the law"; slurs calling opposing counsel and Gardiner "charlatans" and suggesting that they "re-attend grade school to re-lea[r]n their reading skills"; and claims that the trial judge was guilty of "obvious legal negligence, incompetence, bias and prejudice." After a hearing on September 25, 2008, the trial court denied York's motion to dismiss, finding, among other things, that York had received adequate notice of the wrongful lien hearing.[6] The trial court also concluded that York should have requested a continuance, rather than simply failing to attend the hearing. York did not file a timely appeal of that order.

¶ 7 Five months later, on February 27, 2009, Gardiner filed a motion for a supplemental hearing to enforce the April 21, 2008 order, to which York responded with a motion to dismiss. Gardiner then filed a motion for rule 11 sanctions, see Utah R. Civ. P. 11, which requested, among other things, that York be barred from further filing written materials without the assistance of a licensed attorney. York then filed a rule 60(b) motion to set aside the wrongful lien order. The trial court denied both York's rule 60(b) motion and Gardiner's motion for sanctions at an April 22, 2009 hearing. In response, York filed a motion to disqualify the trial court judge, accusing him of "bias and prejudice"; giving "special treatment" to his "fellow bar members"; making up evidence; fraud; "violations of the judicial canon, his oath of office, his oath as an attorney, [and] his oath as a Marine"; "criminal activity"; and "corruption." The presiding judge of the district court denied York's motion to disqualify on May 22, 2009.

¶ 8 On May 27, 2009, the trial court, acting on its own motion and without hearing, issued a Finding and Judgment of Contempt (contempt order), in which it referred to York's history of frivolous and disrespectful pleadings and behavior, and found that York's motion to disqualify "clearly enter[ed] the realm of conduct proscribed in *Peters v. Pine Meadow Ranch Home Ass'n*, 2007 UT 2, 151 P.3d 962." The trial court found York in contempt and sentenced him to two days in jail. The trial court also declared York to be a "vexatious litigant" and as "a further sanction" restricted him from filing any "pleadings or other papers whatsoever in the Utah State District Courts unless the pleading is accompanied by a certificate from a District Court Judge certifying that the paper has potential merit and is not scandalous, vexatious or disrespectful." York has completed his two-day jail sentence.

¶ 9 On May 28, 2009, the trial court entered a written order denying York's motion to set aside the wrongful lien judgment under rule 60(b). York timely appealed the order denying his rule 60(b) motion and the contempt order. The parties filed cross-motions for summary disposition, which we denied pending plenary consideration. In addition to denying summary disposition, we requested additional briefing on specific issues. Although the briefing provided by the parties, both initially and in response to our request for supplementation, was inadequate, *see generally* Utah R.App. P. 24 (enumerating briefing requirements), we exercise our discretion to address the issues raised by this appeal, *see State v. Gamblin*, 2000 UT 44, ¶ 8, 1 P.3d 1108 ("[W]e are not obligated to strike or disregard a marginal or inadequate brief, and in this case we choose to further address defendant's arguments in the interests of justice."). We do so to give guidance to trial courts struggling with the difficulties presented by unruly litigants. Thus, we now address the issues raised in this fifth appeal concerning a dispute that began a decade ago over $7182.

---

**6.** York argued that service was defective because rule 6 of the Utah Rules of Civil Procedure provides that notice of a hearing be served at least five days before the hearing, unless otherwise provided by rule or order, *see* Utah R. Civ. P. 6(d).

## ISSUES AND STANDARDS OF REVIEW

¶ 10 York challenges the court's denial of his rule 60(b) motion to set aside, claiming that the trial court lacked jurisdiction. We have previously explained that

[a]n appeal of a Rule 60(b) order addresses only the propriety of the denial or grant of relief. The appeal does not, at least in most cases, reach the merits of the underlying judgment from which relief was sought. Appellate review of Rule 60(b) orders must be narrowed in this manner lest Rule 60(b) become a substitute for timely appeals.

*Franklin Covey Client Sales v. Melvin*, 2000 UT App 110, ¶ 19, 2 P.3d 451 (emphasis omitted) (quoting James Wm. Moore et al., *Moore's Federal Practice* § 60.68[3] (3d ed. 1999)). However, "when a [rule 60(b)] motion to vacate ... is based on a claim of lack of jurisdiction, the district court has no discretion. Therefore, we review this issue for correctness." *State v. All Real Prop.*, 2001 UT App 361, ¶ 5, 37 P.3d 276 (alteration in original) (citation and internal quotation marks omitted).

¶ 11 York also maintains that the trial court erred in finding him guilty of contempt and in imposing sanctions against him. "We review a trial court's exercise of its contempt power to determine whether it exceeded the scope of its lawful discretion," *Shipman v. Evans*, 2004 UT 44, ¶ 39, 100 P.3d 1151, which "is subject to constitutional and statutory restraints regarding [due process]," *Chen v. Stewart*, 2005 UT 68, ¶ 36, 123 P.3d 416 (internal quotation marks omitted).

## ANALYSIS

### I. Rule 60(b) Motion to Reconsider

¶ 12 We first consider York's appeal from the order denying his rule 60(b) motion. Al-

though York raised multiple reasons for reconsideration in the trial court, he raises only one of these on appeal: that the underlying judgment was void. In response, Gardiner contends that York's rule 60(b) motion cannot be considered because it was not timely.

### A. York's Rule 60(b) Motion Was Untimely Unless the Judgment Is Void.

¶ 13 While most grounds for relief from a judgment must be raised within three months of its entry, a motion for reconsideration based on a claim that the judgment is void need only be made "within a reasonable time ... after the judgment, order, or proceeding was entered or taken." [7] Utah R. Civ. P. 60(b). York filed his rule 60(b) motion ten months after entry of the judgment. Accordingly, it was untimely unless it was based on a claim that the judgment was void. York asserts that Gardiner lacked standing to bring an action under the Wrongful Lien Act (the Act), thereby divesting the trial court of jurisdiction. Consequently, York contends that the underlying judgment is void.[8] Assuming without deciding that a collateral attack on Gardiner's standing would render the judgment void, we nevertheless reject York's argument because Gardiner was within the class of persons authorized to bring a wrongful lien claim.

### B. Gardiner Had Standing to Bring a Wrongful Lien Claim Against York.

¶ 14 Pursuant to the Act, "[a]ny record interest holder of real property against which a wrongful lien ... has been recorded may petition the district court ... for summary relief to nullify the lien." Utah Code Ann. § 38-9-7 (2005). Thus, to determine whether Gardiner was authorized to

---

7. This more flexible time restriction also applies when "the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application," or for other reasons not otherwise provided for in the rule "justifying relief from the operation of the judgment." Utah R. Civ. P. 60(b). None of these grounds were argued on appeal.

8. York also contends that the complaint Gardiner filed did not constitute a "petition" within the meaning of the Act, that Gardiner's petition was not supported by a sworn affidavit, and that Gardiner's service of the petition and notice of hearing only two days before the hearing did not comply with rule 6 of the Utah Rules of Civil Procedure. Because none of these alleged deficiencies would render the underlying judgment void, we reject them as untimely. *See generally* Utah R. Civ. P. 60(b).

bring a wrongful lien action against York, we must determine whether Gardiner is a "record interest holder" of the warehouse. "[O]ur primary goal in interpreting statutes is to give effect to the legislative intent, as evidenced by the plain language, in light of the purpose the statute was meant to achieve. We need look beyond the plain language only if we find some ambiguity." *UDOT v. Ivers*, 2009 UT 56, ¶ 22, 218 P.3d 583 (alteration in original) (citation and internal quotation marks omitted).

■ ¶ 15 The definition section of the Act provides,

> "Record interest holder" means a person who holds or possesses a present, lawful property interest in certain real property, including an owner, titleholder, mortgagee, trustee, or beneficial owner, and whose name and interest in that real property appears in the county recorder's records for the county in which the property is located.

Utah Code Ann. § 38–9–1(4)(a) (Supp.2009). We conclude that Gardiner has a lawful property interest in the warehouse by virtue of the judgment lien that was recorded on January 2, 2008, in the property records of Millard County.[9] *See generally Webb v. Interstate Land Corp.*, 920 P.2d 1187, 1190 (Utah 1996) (defining liens as a right in real estate).

¶ 16 Although "judgment lien" is not specifically listed in the definition of "record interest holder," the enumerated list is not exclusive. *See* Utah Code Ann. § 38–9–1(4)(a) (defining record interest holders as "including" those listed). Furthermore, the interest of a judgment lien holder and that of a mortgagee are similar in that each creates an encumbrance against the property. *See Vestin Mortgage, Inc. v. First Am. Title Ins. Co.*, 2006 UT 34, ¶ 13 n. 8, 139 P.3d 1055 (citing favorably the definition in *Black's*

*Law Dictionary* 547 (7th ed. 1999), which states that an encumbrance is a "claim or liability that is attached to property or some other right that might lessen its value, such as a lien or mortgage"); *see also Webb*, 920 P.2d at 1190 ("An encumbrance 'includes real estate mortgages and other liens on real estate and all other rights in real estate that are not ownership interests.'" (emphasis omitted) (quoting Utah Code Ann. § 70A–9–105(1)(g) (1990))).[10]

¶ 17 Moreover, the fact that the Act includes a separate definition of "record owner," *see* Utah Code Ann. § 38–9–1(5) ("'Record owner' means an owner whose name and *ownership* interest in certain real property is recorded or filed in the county recorder's records for the county in which the property is located." (emphasis added)), indicates that the term "record interest holder" encompasses a broader spectrum of property interests than ownership. Rather than limiting the right to bring a wrongful lien action to persons with an ownership interest in the property, the legislature expressly provided that right to the more inclusive class of record *interest* holders.

¶ 18 Because the list in section 38–9–1(4)(a) is not exclusive, and because a judgment lien is similar to the interests expressly included, we hold that Gardiner is a record interest holder for purposes of the Act. *See generally Ball v. Public Serv. Comm'n (In re Questar Gas Co.)*, 2007 UT 79, ¶ 54, 175 P.3d 545 (observing that the doctrine of ejusdem generis "declares that in order to give meaning to the general term, the general term is understood as restricted to include things of the same kind, class, character, or nature as those specifically enumerated, unless there is something to show a contrary intent" (internal quotation marks omitted)). Although Gardiner was not a record owner, *see Citizens Bank v. Elks Bldg., N.V.*, 663 P.2d 56,

---

9. Utah Code section 76–6–503.5 further indicates that a lien holder has a "present and lawful property interest" within the meaning of Utah Code section 38–9–1 because it defines the crime of "wrongful lien" as being committed when someone files a lien "having no objectively reasonable basis to believe he has a *present and lawful property interest in the property* or a claim on the assets." Utah Code Ann. § 76–6–503.5 (2008) (emphasis added).

10. Although the Uniform Commercial Code has been amended since the decision in *Webb v. Interstate Land Corp.*, 920 P.2d 1187 (Utah 1996), the current version is substantively identical with respect to the definition of encumbrance, *compare* Utah Code Ann. § 70A–9a–102(32) (2009), *with id.* § 70A–9–105(1)(g) (1990).

59 (Utah 1983) ("[A] lien ... does not give [the lienholder] an *ownership* interest in the property." (emphasis added)), he had a lawful, recorded property interest in the warehouse and therefore had standing to bring the wrongful lien claim against York as a record interest holder. Accordingly, the underlying judgment was not void, and we affirm the trial court's denial of York's rule 60(b) motion.

## II. Filing Restrictions and Contempt Conviction

■ ¶ 19 We next consider the trial court's imposition of filing restrictions and contempt sanctions against York. In doing so, we acknowledge that trial courts are often impeded in their efforts to resolve legal disputes by the inappropriate conduct of litigants, some of whom appear without counsel. While we reaffirm the prerogative of trial courts to use the contempt power and other appropriate remedies to maintain order in matters that come before them, we caution that the exercise of that power must be consistent with constitutional due process requirements. *See International Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 838, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994); *Chen v. Stewart*, 2005 UT 68, ¶ 36, 123 P.3d 416.

¶ 20 In the hope of assisting trial courts with the difficult task of maintaining the dignity of the litigation process, we take this opportunity to examine the tools available in dealing with problem litigants and the constitutional limitations on their use. In particular, we discuss the trial court's power to strike pleadings or portions of pleadings, to impose sanctions restricting the ability of vexatious litigants to file additional pleadings, and to hold litigants in contempt. We address each of these sanctions and their applicability to this case in turn.

### A. Trial Courts Have the Authority to Strike Inappropriate Pleadings.

¶ 21 The most frequent remedy used by trial courts to address disrespectful or abusive pleadings is to strike either the objectionable language or the entire pleading. *See Schleper v. Ford Motor Co.*, 585 F.2d 1367, 1372 (8th Cir.1978). Utah courts are given explicit authority to "strike and disregard all or any part of a pleading or other paper that contains redundant, immaterial, impertinent or scandalous matter." Utah R. Civ. P. 10(h); *see also* Utah R.App. P. 24(k) (stating that appellate briefs should be "free from burdensome, irrelevant, immaterial or scandalous matters" and may be "disregarded or stricken" if they are not). Indeed, this remedy was recently employed by the Utah Supreme Court in *Peters v. Pine Meadow Ranch Home Ass'n*, 2007 UT 2, 151 P.3d 962, resulting in the rejection of the appellant's briefs and the summary affirmance of the decision of this court. *See id.* ¶ 23.

¶ 22 Although the trial court here relied on the *Peters* decision as justification for its contempt order, the supreme court actually struck the petitioner's briefs there pursuant to the Utah Rules of Appellate Procedure, *see* Utah R.App. P. 24(k), because they contained attacks that were "unfounded, scandalous, irrelevant ..., and disrespectful of the judiciary," *Peters*, 2007 UT 2, ¶ 23, 151 P.3d 962.[11] *Peters* did not involve the more serious sanctions imposed here—filing restrictions and incarceration for criminal contempt. Consequently, we find *Peters* of limited utility in analyzing the issues raised by this appeal.

### B. The Trial Court Erred in Imposing Filing Restrictions on York Without Giving Him Prior Notice and an Opportunity to Object.

■ ¶ 23 Where litigants demonstrate disregard for the judicial process by filing frivolous or disrespectful papers, they increase the costs of litigation, waste precious judicial resources, and insert an uncivil and unproductive tone into the proceedings. To address repeated violations of decorum, the trial court may impose sanctions on the liti-

---

**11.** The Wyoming Supreme Court recently adopted a similar approach. *See Richard v. Gose*, 2009 WY 131, ¶¶ 4–5, 218 P.3d 945, 947 (Wyo.2009) (striking brief containing disrespectful and intolerable language impugning the trial judge, and summarily affirming the trial court's order granting summary judgment in favor of the other party).

gant that go beyond simply striking the most recent offensive submission. These sanctions are intended to ensure that materials filed with the court in the future are meritorious and free from scandalous content. *See Lundahl v. Quinn,* 2003 UT 11, ¶¶ 14–16, 67 P.3d 1000. Typically, these restrictions are used as a means of "maintain[ing] the orderly disposition of matters," *see id.* ¶ 15, rather than as a penalty for contempt. However, the imposition of filing restrictions interferes with a litigant's access to the courts and must, therefore, comport with due process requirements. *See* U.S. Const. amend. XIV, § 1.[12]

¶ 24 Although Utah courts have imposed filing restrictions as sanctions for individuals who routinely file frivolous claims or are persistently disrespectful in their pleadings, *see, e.g., Lundahl,* 2003 UT 11, ¶ 14, 67 P.3d 1000, we have not expressly adopted the classification of "vexatious litigant" implemented by the federal courts, *see, e.g., Molski v. Evergreen Dynasty Corp.,* 500 F.3d 1047, 1056–62 (9th Cir.2007) (per curiam). Even in the absence of the "vexatious litigant" nomenclature, however, the Utah appellate courts have authorized case-specific procedures to curtail recurring, abusive litigation tactics. For example, in response to one litigant having filed in the supreme court and the court of appeals "no fewer than twenty-seven filings," most of which were frivolous and disrespectful, the supreme court, in *Lundahl,* 2003 UT 11, 67 P.3d 1000, ordered the clerk of the supreme court to allow only a conditional waiver of filing fees subject to revocation upon the litigant's further violation of the rules against frivolous pleadings. *See id.* ¶¶ 2, 5, 14–15. The *Lundahl* court also advised other Utah courts to "take note of [its] ruling and respond appropriately" to future frivolous filings brought by the litigant. *Id.* ¶ 15. The *Lundahl* court further warned that the litigant's "privilege to access to the courts will be preserved in

direct proportion to her willingness to accept the responsibilities accompanying that privilege." *Id.* ¶ 16; *see also Thomas v. Sibbett,* 925 P.2d 1286, 1286–87 (Utah Ct.App.1996) (restricting litigant from filing pro se lawsuits without the permission of the court where the court found that his "filings demonstrate[d] a pattern of abusive conduct").

¶ 25 The implementation of such restrictions, however, is not without limitation. In *Tripati v. Beaman,* 878 F.2d 351 (10th Cir.1989), the Tenth Circuit Court of Appeals identified specific due process requirements that must be met before a court may restrict a litigant's access to the courts: (1) the order imposing the restrictions should set forth "the litigant's abusive and lengthy history"; (2) the court should provide "guidelines as to what [the party being sanctioned] must do to obtain the court's permission to file an action"; and (3) the party being sanctioned must be given "notice and an opportunity to oppose the court's order before it is instituted." *Id.* at 353–54; *see also Florida Bar v. Thompson,* 979 So.2d 917, 920 (Fla.2008) (rejecting litigant's argument that filing restrictions violated his constitutional right of access to the courts where litigant was warned that such sanctions would be imposed if he continued to submit inappropriate filings, the procedure for filing future pleadings was explained, and the court held a show cause hearing before the sanctions took effect). We agree with the Tenth Circuit that these requirements should be met before filing restrictions are imposed and now consider whether this threshold has been met here.

¶ 26 With respect to the first *Tripati* requirement, we are satisfied that the trial court set forth York's abusive and lengthy history. Indeed, in its order, the trial court stated that "[i]n his motion [to disqualify], Mr. York . . . . [a]ccused the Court and counsel of violating the law and the tenor of his

---

12. Because York does not argue that his state due process rights, *see* Utah Const. art. I, § 7, were violated, we do not analyze them separately, *see State v. Lafferty,* 749 P.2d 1239, 1247 n. 5 (Utah 1988) ("As a general rule, we will not engage in state constitutional analysis unless an argument for different analyses under the state and federal constitutions is briefed."). We note,

however, that while state due process requirements may be interpreted to provide more expansive protections than the United States Constitution, the state requirements must provide at least as much process as that imposed by the United States Constitution. *See State v. Briggs,* 2008 UT 83, ¶ 24, 199 P.3d 935.

argument is one of accusing the Court and counsel of illegal conduct"; that "Mr. York ha[d] operated on the edge of the law [ ] for some time ... by making disparaging remarks about opposing counsel"; that "Mr. York's comments [were] unfounded, scandalous and disrespectful"; and that Mr. York had filed "frivolous matters before the Court, including his suit against [Gardiner's counsel] personally."

¶ 27 The trial court also complied with the second *Tripati* requirement by specifically identifying the method by which York could continue to submit filings. The order expressly provides that York may file material with the court if "the pleading is accompanied by a certificate from a District Court Judge certifying that the paper has potential merit and is not scandalous, vexatious or disrespectful."

¶ 28 However, the record on appeal does not reflect compliance with the due process threshold established by the third prong of the *Tripati* analysis: notice and an opportunity to object before the restrictions are implemented. Appropriate notice requires either warning of the possibility of sanctions—by the court's admonition, the motion of the other party, or a hearing on the matter—or a provision in the order itself identifying a method and time to object prior to implementation of the order. *See Cok v. Family Ct.*, 985 F.2d 32, 35 (1st Cir.1993) (stating that examples of appropriate notice include recommendation of a magistrate that the district court impose restrictions, motion of opposing party to enjoin future filings, court-issued order to show cause, or prior warning from the court); *Ketchum v. Cruz*, 961 F.2d 916, 921 (10th Cir.1992) (holding that court's warning in prior order that the court may restrict litigant's access to the courts if he continued with vexatious litigation provided sufficient notice); *Tripati*, 878 F.2d at 354 (holding that "[t]he notice and opportunity requirement does not ... require an in-person hearing" and that any objections may be reduced to writing); *Gra-*

ham v. Secretary of Health & Human Servs.*, 785 F.Supp. 145, 146–47 (D.Kan.1992) (stating that the court complied with the notice and opportunity requirement by giving plaintiff thirty days to file a written objection to the filing restrictions proposed by the court in its opinion (citing *Tripati*, 878 F.2d at 354)).

¶ 29 Nothing in the record designated on appeal shows that the trial court warned York that it was considering sanctions based on the scandalous nature of his written submissions. The minutes from the April 22, 2009 hearing indicate that the trial court specifically denied a motion for sanctions made by Gardiner, which had requested, among other things, that York be barred from filing additional pleadings or memoranda without the assistance of a licensed attorney.[13] The motion for sanctions, however, was based on York's failure to comply with rule 11 only. *See generally* Utah R. Civ. P. 11(b)(2) ("By presenting a ... paper to the court ... an attorney or unrepresented party is certifying that ... [the] legal contentions are warranted by existing law or by a nonfrivolous argument...."). Neither Gardiner's motion for sanctions nor the trial court's written order denying it addressed the contemptuous language contained in York's motion. Under these circumstances, the record on appeal indicates that the trial court issued its May 27, 2009 contempt order sua sponte, with no advance notice of its intent to impose filing restrictions as a sanction for the filing of scandalous materials and without specifying a method for York to object before the order became effective. Consequently, we reverse the imposition of the filing restrictions and remand for further proceedings complying with the due process requirements identified in *Tripati*. By doing so, we do not suggest that such restrictions were inappropriate. Rather, we hold that before York's access to the courts may be curtailed, he must be afforded procedural due process.

---

**13.** York did not include a transcript of the April 22, 2009 hearing in the record on appeal. In the absence of that transcript, we presume the regularity of the proceeding in the trial court. *See*

*State v. Cramer*, 2002 UT 9, ¶ 28, 44 P.3d 690. In this case, that means we presume that the trial court had an adequate basis for the *denial* of Gardiner's motion for rule 11 sanctions.

C. The Trial Court Erred by Summarily Issuing the Contempt Order.

¶ 30 York next challenges the trial court's order holding him in contempt and sentencing him to two days in jail as a sanction for the content of his written submissions. Prior to filing his appeal, however, York completed his two-day sentence. If the "substantive issues are resolved prior to appeal" or "the requested relief cannot affect the rights of the litigants," the matter is moot and we will not consider it. *Saunders v. Sharp*, 818 P.2d 574, 577 (Utah Ct.App. 1991) (internal quotation marks omitted) (citing *Salt Lake City v. Tax Comm'n*, 813 P.2d 1174, 1177 (Utah 1991)). Thus, we begin our analysis by determining whether this issue is moot. Under the facts of this case, we hold that it is not.

1. York's Challenge to the Contempt Order Is Not Moot.

¶ 31 There are two types of contempt: criminal and civil. *See Von Hake v. Thomas*, 759 P.2d 1162, 1167 & n. 2 (Utah 1988). Although the completion of a jail term ordered for civil contempt should fully resolve the issue and render any further action moot, a conviction of criminal contempt may result in consequences to the contemnor independent of the time served in jail and from which this court can grant relief. Thus, we must first determine whether the trial court held York in civil or criminal contempt.

¶ 32 While both criminal and civil contempt may be punished by incarceration, the purpose of the sentence is different for each offense. *See id.* at 1168. Contempt punished by imprisonment is considered to be criminal when the sentence is fixed and civil when the sentence is conditional. *See id.* at 1168 n. 5. A fixed sentence indicates a punitive intent because it consists of imprisonment for a specified amount of time that cannot be altered by a change in the contemnor's behavior. *See Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 632, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988). On the other hand, conditional sentences are remedial in that "the defendant stands committed unless and until he performs the affirmative act required by

the court's order." *Id.* (internal quotation marks omitted); *see also Von Hake*, 759 P.2d at 1168 n. 5 (adopting the Supreme Court's approach in *Feiock*, 485 U.S. 624, 108 S.Ct. 1423). The fact that York's sentence was fixed indicates that he was convicted of criminal contempt. Indeed, the court's contempt order expressly states that the purpose of York's contempt conviction was punitive: "Mr. York ... still evidently needs a stronger motive to learn responsibilities as well as rights accompany his citizenship...."

¶ 33 A challenge to a conviction of criminal contempt is not moot if there is a possibility that collateral legal consequences may result from the conviction. *See Sibron v. New York*, 392 U.S. 40, 57, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) (criminal cases generally); *Adams v. Adams*, 2004 UT App 106U, para. 2, 2004 WL 795908 (mem.) (criminal contempt). In *Sibron*, 392 U.S. 40, 88 S.Ct. 1889, the United States Supreme Court held that "a criminal case is moot only if it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction." *Id.* at 57, 88 S.Ct. 1889. We have previously applied this holding to conclude that criminal contempt convictions are not moot if collateral legal consequences may result, even if the sentence has been served. *See Adams*, 2004 UT App 106U, para. 2; *see also In re Giles*, 657 P.2d 285, 286–87 (Utah 1982) (applying *Sibron* to hold that a post release challenge of involuntary commitment to a mental institution was not moot). Gardiner has not demonstrated that there is no possibility that York will suffer collateral legal consequences as a result of his criminal contempt conviction. Therefore, the issue of whether York was properly held in contempt is not moot.

2. Whether York's Actions Constitute Direct or Indirect Criminal Contempt, Due Process Required Notice and an Opportunity to Be Heard.

¶ 34 Of the tools available to the trial courts for maintaining order, criminal contempt is the most severe and subject to the strictest due process requirements. Because the contempt power is "uniquely ... 'liable to abuse,'" *International Union,*

*United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994) (quoting *Bloom v. Illinois*, 391 U.S. 194, 202, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968)), and "is a drastic remedy[, it] should be invoked only when the right to its use is clear," *United States v. Peterson*, 456 F.2d 1135, 1139 (10th Cir.1972). Furthermore, "[s]ummary contempt proceedings are permissible only when the misbehavior is committed in the presence of the judge and is known to him personally requiring corrective steps to restore and maintain the dignity and authority of the court." *Id.* at 1139 (citing *Illinois v. Allen*, 397 U.S. 337, 344–45, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970)). "Our jurisprudence in the contempt area has attempted to balance the competing concerns of necessity and potential arbitrariness by allowing a relatively unencumbered contempt power when its exercise is most essential, and requiring progressively greater procedural protections when other considerations come into play." *International Union*, 512 U.S. at 832, 114 S.Ct. 2552.

¶ 35 The Utah Legislature has provided statutory contempt authority, *see* Utah Code Ann. § 78B–6–302 (2008), which together with the common law, provides the basis of a Utah court's power to hold offenders in contempt. *See Von Hake*, 759 P.2d at 1166–67. Utah Code section 78B–6–302 provides,

> (1) When a contempt is committed in the immediate view and presence of the court, or judge at chambers, it may be punished summarily. An order shall be made, reciting the facts occurring in the immediate view and presence of the court. The order shall state that the person proceeded against is guilty of a contempt and shall be punished as prescribed in Section 78B–6–310.

> (2) When the contempt is not committed in the immediate view and presence of the court or judge, an affidavit or statement of the facts by a judicial officer shall be presented to the court or judge of the facts constituting the contempt.

Utah Code Ann. § 78B–6–302. The trial court found that York's "comments [in the motion to disqualify and other submissions] were made in a manner that placed them in the immediate presence of the Court, and in proceedings before it while the Court [was] engaged in the performance of official duty." *See generally* Utah Code Ann. § 78A–2–218 (2008) (permitting summary contempt for actions committed in the presence of the court). The trial court then proceeded to punish York summarily, sentencing him to two days in jail. *See generally* Utah Code Ann. § 78B–6–302(1). York contends that he was deprived of his liberty without adequate due process of law.[14]

¶ 36 Despite the statutory contempt powers, our supreme court has cautioned that "[t]he fourteenth amendment's due process clause requires that one facing the possibility of a contempt order must be afforded certain minimal procedural protections." *Von Hake v. Thomas*, 759 P.2d 1162, 1169 (Utah 1988). The extent of the process required has historically varied depending on whether the contempt was committed in the immediate presence of the court, *see* Utah Code Ann. § 78B–6–302(1), which is typically referred to as direct contempt, or outside the presence of the court, *see id.* § 78B–6–302(2), thereby constituting indirect contempt. *See Von Hake*, 759 P.2d at 1169–70. While direct contempt can be punished summarily, indirect contempt can only be sanctioned after notice and an opportunity to be heard. *See Khan v. Khan*, 921 P.2d 466, 468 (Utah Ct.App.1996). However, "even for state proceedings, the label affixed to a contempt ultimately 'will not be allowed to defeat the applicable protections of federal constitutional law.'" *International Union*, 512 U.S. at 838, 114 S.Ct. 2552 (quoting *Feiock*, 485 U.S. at 631, 108 S.Ct. 1423).

¶ 37 The Utah appellate courts have not previously considered whether contemptuous statements made in written materials filed with the court are made within the immedi-

---

**14.** Although the question of whether a criminal contempt order has been properly entered involves both procedural and substantive issues, *see Von Hake v. Thomas*, 759 P.2d 1162, 1169 (Utah 1988), York challenged only procedural due process on appeal. Consequently, we assume for purposes of our analysis that the written materials filed with the trial court were substantively contemptuous.

ate view and presence of the court, thereby justifying summary contempt procedures, *see* Utah Code Ann. § 78B–6–302(1). Other jurisdictions that have considered the issue have not been in agreement. Relying primarily on the fact that reading the offensive submission gives the court knowledge of the facts constituting the contempt, a number of jurisdictions have held that filing contemptuous materials occurs in the presence of the court and constitutes direct contempt. *See, e.g., Owens v. Dancy,* 36 F.2d 882, 885 (10th Cir.1929) (holding that the filing of a verified pleading containing inappropriate material constituted contemptuous conduct in the presence of the court); *People ex rel. Kunce v. Hogan,* 67 Ill.2d 55, 7 Ill.Dec. 63, 364 N.E.2d 50, 52 (1977) (holding that the filing of contemptuous documents can constitute direct contempt); *State ex rel. Hess v. Guste,* 603 So.2d 196, 197 (La.Ct.App.1992) (recognizing that contemptuous documents filed with the court were defined by statute as direct contempt); *Malee v. District Ct.,* 275 Mont. 72, 911 P.2d 831, 833 (1996) (overruling prior decisions to the contrary and holding that "contemptuous pleadings and briefs presented to the court are direct contempt in that they are in the immediate view and presence of the court or judge at chambers" (internal quotation marks omitted)).

¶ 38 In contrast, other jurisdictions have concluded that filing offensive material does not satisfy the requirements of direct contempt. *See, e.g., Schleper v. Ford Motor Co.,* 585 F.2d 1367, 1372 (8th Cir.1978) (holding by majority of panel that contumacious interrogatories constitute indirect contempt); *Fox v. State,* 490 So.2d 1288, 1291 (Fla.Dist.Ct. App.1986) (holding that false statements in an affidavit supporting a motion for post conviction relief constitute indirect contempt because "the adjudication was based on the pleadings, not on what happened in the courtroom," and that "any doubt as to which type of contempt is involved should be resolved in favor of the contemnor"); *State v. Dean,* Clark App. Nos. 2006CA61/2006CA63, 2007–Ohio–1031, at ¶ 23, 2007 WL 706799 ("We have held that the libeling of the trial

court in motions and memoranda does not constitute direct contempt."); *Gilbert v. State,* 648 P.2d 1226, 1233 (Okla.Crim.App. 1982) (holding that a contemptuous motion to disqualify hand-delivered to the trial judge in chambers did not constitute direct contempt).

¶ 39 Although the courts that have considered the issue disagree as to whether the filing of contemptuous pleadings or briefs should be categorized as direct or indirect contempt, the resolution of that issue is no longer determinative of whether summary contempt sanctions are appropriate. This is because even a direct contempt charge may require more due process than that afforded by a summary proceeding. In *Pounders v. Watson,* 521 U.S. 982, 117 S.Ct. 2359, 138 L.Ed.2d 976 (1997) (per curiam), the United States Supreme Court explained,

> [T]he summary contempt exception to the normal due process requirements, such as hearing, counsel, and the opportunity to call witnesses, includes only charges of misconduct in open court, in the presence of the judge, which disturbs the court's business, where all of the essential elements of the misconduct are under the eye of the court, are actually observed by the court, *and where immediate punishment is essential* to prevent demoralization of the court's authority before the public.

*Id.* at 988, 117 S.Ct. 2359 (emphasis added) (internal quotation marks omitted); *see also Harris v. United States,* 382 U.S. 162, 164, 86 S.Ct. 352, 15 L.Ed.2d 240 (1965) (noting that the federal summary criminal contempt rule, Fed.R.Crim.P. 42(a),[15] is "reserved for exceptional circumstances" where "speedy punishment may be necessary to achieve summary vindication of the court's dignity and authority" (internal quotation marks omitted)); *In re Petersen,* 441 F.3d 1266, 1268 (10th Cir. 2006) (holding that a defense attorney's tardiness of five minutes did not "portend a threat to [the] court's immediate ability to conduct its proceedings"); *United States v. Peterson,* 456 F.2d 1135, 1139 (10th Cir.1972) (noting that "to safeguard constitutional pro-

---

**15.** "Federal Rule of Criminal Procedure 42(a) is substantially similar to section 78–32–3 [(now codified as section 78B–6–302)] of the [Utah] Code; both allow summary proceedings for direct contempt." *Von Hake,* 759 P.2d at 1170.

cedures" the United States Supreme Court has limited the exercise of summary contempt power to cases "where instant action is necessary to restore and preserve order and to maintain the authority of the court").

■■■■ ¶ 40 Thus, the United States Supreme Court requires that the contemnor be afforded appropriate due process in all criminal contempt cases except those where the contemptuous conduct occurs in open court or in the presence of the judge, disturbs the court's business, and necessitates immediate punishment. *See Pounders,* 521 U.S. at 988, 117 S.Ct. 2359. This is true irrespective of whether the contempt is direct or indirect:

> [A] summary proceeding is not authorized simply because the conduct constitutes direct contempt. Even if the external facts are clear because they took place in the presence of the judge, the effect of the contumacious conduct must create a "need for speed" to immediately suppress the court-disrupting misbehavior and restore order to the proceedings. [Dan B.] Dobbs, [*Contempt of Court: A Survey,*] 56 Cornell L.Rev. [183,] 229 [ (1971) ]. Absent that need, an evidentiary hearing is required even though the contempt is 'direct.'"

*Dean,* 2007–Ohio–1031, at ¶ 22. Indeed, "[summary] punishment always, and rightly, is regarded with disfavor." *Taylor v. Hayes,* 418 U.S. 488, 497–98, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974) (alteration in original) (internal quotation marks omitted); *see also International Union, United Mine Workers of Am. v. Bagwell,* 512 U.S. 821, 832, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994) ("The necessity justification for the contempt authority is at its pinnacle, of course, where contumacious conduct threatens a court's immediate ability to conduct its proceedings, such as where a witness refuses to testify, or a party disrupts the court."). Where conviction and punishment for contemptuous behavior committed during trial is delayed until after trial, there is no need for speed and criminal contempt sanctions may not be imposed summarily. *See Taylor,* 418 U.S. at 498–99, 94 S.Ct. 2697.

¶ 41 The Utah Supreme Court has long held a similar view. In *Von Hake v. Thomas,* 759 P.2d 1162 (Utah 1988), a judgment debtor was ordered to appear at a hearing to answer questions about his assets and to bring all relevant documents, including his tax returns. *See id.* at 1164. Eventually, the debtor was held in contempt for failing to appear and for refusing to produce some of the tax documents. *See id.* at 1166. In affirming the trial court's order sanctioning the debtor for direct contempt, the supreme court relied upon the following unique facts: (1) the contemptuous conduct "directly and immediately" interfered with the hearing; (2) the judge had personal knowledge of the contemptuous conduct; (3) the contemnor knew his conduct would be considered contemptuous; and (4) the contemnor was given ample opportunity to defend his conduct. *See id.* at 1171. Indeed, the *Von Hake* court cautioned that when "such circumstantial justifications for summary proceedings are lacking," the contemnor should be afforded a "reasonable opportunity" to present "the court with facts previously unknown to it which would constitute a valid defense for the charge of contempt." *Id.* at 1171 n. 7.

■■■■ ¶ 42 Thus, whether contemptuous pleadings and other submissions are deemed to have occurred in the presence of the judge or not, summary criminal contempt sanctions may not be imposed in the absence of a need for immediate punishment. *See, e.g., Pounders,* 521 U.S. at 988, 117 S.Ct. 2359; *Malee v. District Ct.,* 275 Mont. 72, 911 P.2d 831, 834 (1996) (holding that contemptuous brief constituted direct contempt, but that contemnor was entitled to an opportunity to be heard); *Dean,* 2007–Ohio–1031, at ¶ 24 ("Regardless of whether the contempt [including offensive pleadings] was direct or indirect, we find that [contemnors] should have been afforded an evidentiary hearing because there was no 'need for speed' to address the allegedly contemptuous conduct."). Because there was no need for immediate action here, we conclude that the criminal contempt sanctions were improperly imposed against York.

¶ 43 The primary offensive pleadings, York's motion to dismiss Gardiner's complaint and motion to disqualify the trial judge, were filed on April 4, 2008, and May 4, 2009, respectively. The trial judge forwarded the motion to disqualify to the presiding

judge of the district for review, pursuant to the applicable recusal procedures, *see* Utah R. Civ. P. 63(b)(2). On May 22, 2009, the presiding judge ruled that York had not raised any proper grounds for disqualification. On May 27, 2009, three weeks after York filed the motion to disqualify and over a year after York filed the motion to dismiss, the trial court issued the contempt order. Under these facts, there was no need for immediate action. *See International Union*, 512 U.S. at 832, 114 S.Ct. 2552 ("If a court delays punishing a direct contempt until the completion of trial, for example, due process requires that the contemnor's rights to notice and a hearing be respected.").

¶ 44 Where a summary proceeding is not justified by a "need for speed," the trial court must comply with procedural due process requirements prior to convicting a litigant of contempt. In *Burgers v. Maiben*, 652 P.2d 1320 (Utah 1982), the Utah Supreme Court held that in cases of indirect criminal contempt procedural due process requires that the defendant "have assistance of counsel, if requested, have the right to confront witnesses, and have the right to offer testimony on his behalf." *Id.* at 1322.[16] The United States Supreme Court has since held that those protections also apply to direct criminal contempt unless the contempt is committed in open court and there is a need for immediate action.[17] *See Pounders v. Watson*, 521 U.S. 982, 988, 117 S.Ct. 2359, 138 L.Ed.2d 976 (1997) (noting that "the summary contempt exception to the normal due process requirements, such as a hearing, counsel, and the opportunity to call witnesses," is limited to misconduct in open court where immediate punishment is essential). Furthermore, to support a conviction for criminal contempt, it must be substantively proven, beyond a reasonable doubt, "that the person cited for contempt knew what was required, had the ability to comply, and intentionally failed or refused to do so." *Von Hake*, 759 P.2d at 1172. "The trial court must enter written findings of fact and conclusions of law with respect to each of the three substantive elements." *Id.*

¶ 45 In this case, there was no need for immediate action, and we must reverse York's contempt conviction. In doing so, we reiterate that trial courts have a variety of tools that can be used to address the problems caused by abusive litigants. *See International Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 833, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994) (reversing summary contempt conviction but noting that courts "have broad authority through means other than contempt . . . to penalize a party's failure to comply with the rules of conduct governing the litigation process"). Trial courts may strike offensive pleadings and, after appropriate warning and opportunity to respond, place filing restrictions on vexatious litigants. If more serious sanctions are needed, the trial court may schedule a show cause hearing to give the contemnor an opportunity to explain why sanctions should not be imposed.[18] *See In re Schulder*, 62 Utah 591, 221 P. 565, 567 (1923) (holding that "failure to file a formal affidavit", as required by Utah Code section 78B–6–302(2), "was not

---

**16.** Trial by jury is only required if the sentence imposed exceeds six months of incarceration or the fines are serious and punitive. *See International Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 837, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994); *Taylor v. Hayes*, 418 U.S. 488, 495, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974).

**17.** In some instances, referral of the contempt proceedings to a different judge may also be necessary. *See generally Taylor*, 418 U.S. at 501, 94 S.Ct. 2697 (holding that if the judge is so embroiled in the controversy that there is an appearance of bias, criminal contempt should be determined by a different judge); *Mayberry v. Pennsylvania*, 400 U.S. 455, 464, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971) ("[W]here conditions do not make it impracticable, or where the delay may

not injure [a] public or private right, a judge called upon to act in a case of contempt by personal attack upon him, may, without flinching from his duty, properly ask that one of his fellow judges take his place." (internal quotation marks omitted)).

**18.** The trial court should impose civil contempt sanctions if they will effectively curtail the contemptuous behavior. *See Shillitani v. United States*, 384 U.S. 364, 372 n. 9, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966) ("[T]he trial judge [should] first consider the feasibility of coercing testimony through the imposition of civil contempt. The judge should resort to criminal sanctions only after he determines, for good reason, that the civil remedy would be inappropriate.").

fatal to the jurisdiction of the court" when the court had issued an order to show cause giving notice and grounds for the contempt charge). An order to show cause appropriately "compli[es] with the Due Process requirement of adequate and timely notice of the charges made against the alleged contemnor." *Khan v. Khan*, 921 P.2d 466, 468–69 (Utah Ct.App.1996).

¶ 46 While these procedural protections may be burdensome, "[d]ue process cannot be measured in minutes and hours or dollars and cents. For the accused contemnor facing a jail sentence, his liberty is valuable and must be seen as within the protection of the Fourteenth Amendment. Its termination calls for some orderly process, however informal." *Taylor v. Hayes*, 418 U.S. 488, 500, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974) (internal quotation marks omitted); *see also Bloom v. Illinois*, 391 U.S. 194, 208, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968) ("We cannot say that the need to further respect for judges and courts is entitled to more consideration than the interest of the individual not to be subjected to serious criminal punishment without the benefit of all the procedural protections worked out carefully over the years and deemed fundamental to our system of justice."). Because the minimum procedural due process requirements for imposition of criminal contempt sanctions were not met here, we reverse the order of contempt.

¶ 47 Nothing in this decision should be interpreted to condone the inappropriate material contained in the briefs and motions that York filed with the trial court. As the Utah Supreme Court has noted, access to the courts may be conditioned on a litigant's willingness to accept the responsibilities accompanying that access. *See Lundahl v. Quinn*, 2003 UT 11, ¶ 16, 67 P.3d 1000. Once the protections of the due process clause are met, courts may take the actions necessary to safeguard the judicial process.

## CONCLUSION

¶ 48 Because the underlying wrongful lien judgment was not void, we affirm the trial court's denial of York's rule 60(b) motion as untimely. However, York was not provided minimum procedural due process before the filing restrictions and criminal contempt sanctions were imposed. Therefore, we reverse the trial court's contempt order and remand for further proceedings consistent with this opinion.

WE CONCUR: JAMES Z. DAVIS, Presiding Judge and J. FREDERIC VOROS JR., Judge.