**2016 UT App 228**

## THE UTAH COURT OF APPEALS

ELITE LEGACY CORPORATION, ASPENWOOD REAL
ESTATE CORPORATION, AND HILARY WING,
Appellees,
*v.*
CHARLES SCHVANEVELDT,
Appellant.

Opinion
Nos. 20130746-CA and 20140978-CA
Filed November 17, 2016

Second District Court, Ogden Department
The Honorable Noel S. Hyde
The Honorable Michael D. Lyon
No. 060906802

Karra J. Porter and Phillip E. Lowry, Attorneys
for Appellant

L. Miles LeBaron and Dallin T. Morrow, Attorneys
for Appellees

JUDGE J. FREDERIC VOROS JR. authored this Opinion, in which
JUDGES GREGORY K. ORME and KATE A. TOOMEY concurred.

VOROS, Judge:

¶1      In this opinion we address two of four appeals arising
from a single lawsuit over a failed real estate deal.[1] The lawsuit
involves a dispute over a real estate sales commission. On one
hand are a real estate brokerage and related individuals
(Plaintiffs); on the other, the property sellers.

---

1. The other two appeals are discussed in *Wing v. Code*, 2016 UT
App 230 (addressing case 20130854-CA) and *Wing v. Still Standing
Stable LLC*, 2016 UT App 229 (addressing case 20130768-CA).

¶2      In case 20140978-CA, appellant Charles Schvaneveldt, one of the sellers, challenges the denial of his motion under rule 60(b) of the Utah Rules of Civil Procedure. That motion sought to vacate the judgment below on the ground that Plaintiffs lacked standing to bring or maintain the action. In case 20130746-CA, Schvaneveldt challenges Plaintiffs' standing, the trial court's ruling that Plaintiffs earned the commission, and the trial court's denial of his summary judgment motion seeking to avoid personal liability for the commission. We affirm on all issues in both appeals.

BACKGROUND

*The Parties*

¶3      Because of the case's complicated record and lengthy history, we begin by identifying the relevant parties and non-parties on appeal.

¶4      Plaintiffs are all related to a company originally known as Aspenwood Real Estate Corporation. Aspenwood was a real estate brokerage company doing business as "Re/Max Elite." Hilary "Skip" Wing and others founded Aspenwood, and Wing at times acted as its principal broker. Tim Shea worked for Aspenwood as a real estate agent. Elite Legacy Corporation has since subsumed Aspenwood. We refer to these parties collectively as Plaintiffs.

¶5      The defendants are all related to the property sellers. Charles "Chuck" Schvaneveldt is the sole member of Still Standing Stable LLC (Still Standing). Cathy Code is Schvaneveldt's wife. Still Standing owned the property in question and, Schvaneveldt claims, contracted with Shea in the For Sale By Owner Agreement. For ease of reference—though not precisely accurate—we refer to Code, Schvaneveldt, and Still Standing collectively as Sellers.

*History of Aspenwood and Re/Max Elite*

¶6     In 2004, Wing and Dale Quinlan—at that time both licensed principal brokers—together with other individuals bought a real estate brokerage called Aspenwood Real Estate Corporation. To align their new brokerage with the national Re/Max real estate franchise, Quinlan submitted a "DBA application" and registered the assumed name "Re/Max Elite" with the Utah Division of Corporations and Commercial Code (the Division). Quinlan listed himself as the registered agent and checked a box indicating that he—not Aspenwood—was the "applicant/owner" of the assumed name. Quinlan, Wing, and the other owners appear to have jointly operated the Aspenwood brokerage under the name Re/Max Elite until July 2005, when Quinlan surrendered his broker license. Although Quinlan remained listed as Re/Max Elite's registered agent, he no longer played any role in the management of Aspenwood. Instead, Wing assumed management of Aspenwood. Aspenwood continued to conduct business under the assumed name Re/Max Elite.

¶7     In March 2006 the Division transferred the Re/Max Elite assumed name from Quinlan to Aspenwood. It did so based on a transfer letter from Quinlan. The parties disagree as to whether Quinlan's signature on the letter is authentic. Plaintiffs maintain that Quinlan made the change. They rely on the declaration of a company officer stating that "Dale Quinlan . . . was tasked by the [Aspenwood] Board of Directors to . . . (1) ensur[e] that Aspenwood, and not Dale Quinlan only, owned the dba RE/MAX Elite . . . and (2) mak[e] Shane Thorpe the registered agent." Sellers maintain that Quinlan's signature on the letter was forged. They rely on a forensic report finding that "it is highly probable" that the transfer letter was a cut-and-paste forgery. The Division later invalidated the transfer.

*The Property*

¶8 In 1998, Still Standing purchased 170 acres of property in Weber County (the Property) from the State of Utah School and Institutional Trust Lands Administration (SITLA). Still Standing purchased the Property with notice from SITLA that "there is likely no access" and that SITLA was "not guaranteeing access to the property." Four years later, Still Standing sued three of the Property's adjoining landowners in an attempt to gain access across the landowners' parcels, which separated the Property from the nearest public road. Still Standing lost the lawsuit and was unable to secure road access to the Property.[2]

¶9 After the lawsuit, Still Standing purchased an unrelated five-acre strip of property located on the opposite side of the public road (the Strip). Although the Strip bordered the Property and contained an easement, that easement did not connect to any public road and thus did not provide access to the Property. During the underlying litigation, at least two title insurance companies—including one hired by Sellers—examined the Property, but no title company was willing to issue a policy insuring access.

---

2. In that lawsuit, the trial court found that Still Standing purchased the Property "without making any attempt to determine whether there was any legal access" and brought its action "knowing it had no legal right of ingress/egress to its land-locked property." The court ultimately ruled that Still Standing's "filing [was] totally frivolous and without factual or legal basis or merit." On appeal, the Utah Supreme Court reversed the trial court's award of attorney fees because bad faith had not been established; Still Standing did not "challenge the trial court's conclusion that its case was without merit." *See Still Standing Stable, LLC v. Allen*, 2005 UT 46, ¶¶ 8, 17, 122 P.3d 556.

*The FSBO and the REPC*

¶10    In January 2006 Cathy Code advertised the Property for sale by owner in a local newspaper. Tim Shea, a real estate agent employed by Aspenwood, expressed interest on behalf of a buyer. After visiting the Property with Schvaneveldt and Code, Shea sent Sellers a For Sale by Owner Commission Agreement and Agency Disclosure Agreement (the FSBO) and, on behalf of potential buyers (Buyers), sent Sellers the first Real Estate Purchase Contract (the First REPC).

¶11    Both contracts were drafted using standard printed forms. Sellers submitted a counteroffer to the First REPC. Sellers signed the FSBO and sent it back to Shea. The two-page FSBO listed "Re/Max Elite (Layton Branch)" as the "company"; "Tim Shea" as the authorized agent for the company; and "Chuck and Cathy Code" as "the seller." Shea signed the FSBO above the "company" line, and Code signed the FSBO above the "Sellers' Signature" line. Among other provisions, the FSBO contained a brokerage-fee clause, a seller-disclosures clause, an attorney-fee clause, and an integration clause.

¶12    This litigation centers on the FSBO's brokerage-fee clause. That clause sets forth the terms of the real estate commission agreement:

> 2. BROKERAGE FEE. The Seller agrees to pay the Company, irrespective of agency relationship(s), as compensation for services, a Brokerage Fee in the amount of $____ or 3% of the acquisition price of the Property, if the Seller accepts an offer from Emmett Warren and or Assigns (the "Buyer"), or anyone acting on the Buyer's behalf, to purchase or exchange the Property. The Seller agrees that the Brokerage Fee shall be due and payable, from the proceeds of the Seller, on the date of recording of

> closing documents for the purchase or exchange of the Property by the Buyer or anyone acting on the Buyer's behalf. If the sale or exchange is prevented by default of the Seller, the Brokerage Fee shall immediately be due and payable to the Company.

After Sellers' counteroffer to the First REPC lapsed, Shea forwarded to Sellers a second offer in the form of another Real Estate Purchase Contract—the REPC relevant to this appeal (the REPC). Schvaneveldt accepted the second offer by signing and returning the REPC to Shea. Schvaneveldt checked the "ACCEPTANCE OF OFFER TO PURCHASE" box, signed his name above the "Sellers' Signature" line, and printed his name above the "Sellers' Name (PLEASE PRINT)" line.[3] The REPC

---

3. The copy of the REPC in the record on appeal shows all of this information. However, Schvaneveldt claims that the copy in the record does not accurately reflect the original. On page six of the record copy, Schvaneveldt's first name, "Chuck," is irregularly placed on the left margin of the page, outside of the provided blank space. Schvaneveldt argues that he wrote "member" in the "unexplained white space" remaining after his name. He suggests that the word "member" was "whited out," presumably by Shea or someone else at Aspenwood. The trial court barred Schvaneveldt from mentioning that the original was not produced, and Schvaneveldt did not preserve a challenge to this ruling, nor has he appealed it. Thus, we do not address it. *See Pratt v. Nelson*, 2007 UT 41, ¶ 14, 164 P.3d 366 ("Generally, in order to preserve an issue for appeal . . . the issue must be specifically raised." (citations and internal quotation marks omitted)). Moreover, even assuming Schvaneveldt did write "member" next to his name, the FSBO—not the REPC—is the operative contract between Plaintiffs and Schvaneveldt. The REPC controls the rights and obligations running between Buyers and Sellers, who have settled their dispute.

required Buyers to deposit $25,000 in earnest money. It required Sellers to "convey good and marketable title to Buyer[s] at Closing by general warranty deed." And it imposed a 15-day seller-disclosure deadline, a 60-day due-diligence deadline, and a 90-day settlement deadline ahead of closing.

¶13    Initially, Buyers and Sellers each fulfilled their REPC obligations. Buyers deposited $25,000 earnest money with Aspenwood, and Sellers made the required disclosures. In the disclosures, Sellers admitted that the Property did not have access from a public road, but stated that there was "direct access to the Property through . . . [a] Private Easement." As the closing date approached, Buyers became increasingly concerned about the lack of insurable access to the Property. But they did not object to the seller disclosures during the 60-day due-diligence window.

¶14    Before closing, Sellers' attorney called Buyers' attorney to inform him that Sellers would be conveying the Property by special warranty deed rather than by general warranty deed; Sellers' escrow and closing instructions also specified that the conveyance would be by special warranty deed. Buyers' attorney responded that a special warranty deed "might be okay if I can get a title policy that's going to guarantee [Buyers] access." But by the time of closing, no title insurance company—including one hired by Sellers—was willing to offer a policy insuring access to the Property. Buyers did not appear at closing.

*Pretrial Proceedings*

¶15    After the deal fell through, Re/Max Elite brought an interpleader action to determine who was entitled to the earnest money it was holding. Re/Max Elite then filed a cross-complaint seeking a sales commission from Still Standing—and later, Schvaneveldt and Code—under the FSBO's brokerage-fee provision. Sellers counterclaimed. Sellers argued—in eight

pretrial motions—that no named plaintiff had standing to sue. Sellers filed six motions under the Assumed Name Statute and two motions under the Real Estate Licensing and Practices Act. In each motion, Sellers' central argument asserted that only Re/Max Elite's principal broker, Wing—and not its agent, Shea— could sue to recover the commission under Utah law. In support, Sellers submitted a summary judgment motion asserting that Wing was Re/Max Elite's principal broker.

¶16    In response, Aspenwood, Elite Legacy, and Wing joined Re/Max Elite in the action as additional plaintiffs to the lawsuit to cure any alleged standing deficiency. After Plaintiffs added Wing, Sellers abandoned their standing arguments until after trial.

¶17    Both parties filed a flurry of additional pretrial motions. In February 2010 Schvaneveldt moved for summary judgment, seeking a ruling that he could not be personally liable for the sales commission. Schvaneveldt asserted that he was involved in the sale only as a representative for Still Standing. He was not personally liable, he argued, because the blank line on the REPC reserved for the property name was filled in with the words "Land LLC Still Standing Stables." Plaintiffs opposed the motion and argued that Schvaneveldt was personally liable because he signed the REPC and because the FSBO listed him (along with Code) as a seller. The court denied Schvaneveldt's motion because the FSBO listed Schvaneveldt—not Still Standing—as the seller.

¶18    In March 2010, Plaintiffs moved for partial summary judgment, seeking a ruling that Plaintiffs had earned a commission under the FSBO as a matter of law. Plaintiffs argued that Sellers became obligated to pay a commission the moment Sellers accepted an offer—the words used by the FSBO. And Sellers accepted an offer, Plaintiffs argued, as soon as they signed the REPC with Buyers. Sellers responded that Plaintiffs

had not brought a "ready, willing, and able" buyer, that the sale was to be a cash transaction, and that Shea had altered the REPC after signing to conceal the deal's cash transaction status. The trial court granted the motion, ruling that Plaintiffs had earned a commission because Sellers had accepted an offer from Buyers. The court explained that any alleged changes to the REPC were a red herring.

¶19　In February 2011 Plaintiffs again moved for summary judgment on the commission claim and on all of Sellers' counterclaims. In March 2011 Still Standing filed a cross-motion for summary judgment, alleging that a breach of Plaintiffs' fiduciary duties had caused the sale to fail. The trial court heard oral arguments on the motions. The court first ruled that the sale failed due to Sellers' failure to guarantee Buyers' access to the Property by providing a general warranty deed or other assurance of access:

> [I]t is undisputed that the lack of a guaranteed access was the sole reason . . . that the transaction failed. . . . [I]t strains credulity to think that somebody would fork over four million [dollars] without a general warranty deed or at least some kind of a guarantee under a special warranty deed that there would be an access.

In light of this ruling, the trial court dismissed Still Standing's fiduciary-duty claims against Plaintiffs on the ground that Sellers' refusal to convey by general warranty deed—prompted by concerns about access and not any breach of fiduciary duty—caused the deal to fail.

¶20　After the trial court dismissed the fiduciary-duty claims and ruled that Plaintiffs had earned the commission, the only question left for trial was which party was responsible to pay that commission.

*Trial*

¶21   In a pretrial hearing with both sides present, the trial court suggested that Still Standing could not be liable for the commission and thus should be dismissed to avoid confusing the jury. Plaintiffs agreed to release Still Standing so long as liability would be determined between Schvaneveldt and Code at trial. The trial court proposed a jury instruction stating that Still Standing was not liable and that the jury must look only to Schvaneveldt and Code for liability. Schvaneveldt and Code did not object to this instruction. Before agreeing to Still Standing's dismissal, Plaintiffs reiterated that they would accept the instruction only if Schvaneveldt and Code would agree not to argue that Still Standing was the liable party. Again, Schvaneveldt and Code did not object.

¶22   Trial proceeded and Schvaneveldt and Code did not mention Still Standing, with one exception: Schvaneveldt argued that he had signed "Member" next to his name on the REPC, indicating that he signed in a representative capacity for Still Standing. When Plaintiffs objected, the court suggested bringing Still Standing back into the case. Schvaneveldt's counsel proposed instructing the jury to disregard the testimony.[4] Plaintiffs agreed to Schvaneveldt's solution, and the court instructed the jury accordingly. At the close of evidence, Schvaneveldt and Code both moved for a directed verdict; the court granted Code's motion but denied Schvaneveldt's. This ruling left Schvaneveldt as the only remaining potentially liable

---

4. At oral argument on appeal, Schvaneveldt's appellate counsel argued that Schvaneveldt's trial counsel objected to Still Standing's dismissal from the case. However, our review of the record shows that Schvaneveldt's trial counsel did not object as the trial court sought input on Still Standing's dismissal.

party. The jury entered a verdict against Schvaneveldt, awarding damages of $30,000.

¶23    Plaintiffs moved for a new trial, arguing that the damage award was inadequate because it did not amount to the 3% commission the court had previously ruled Plaintiffs had earned. Rather than granting a new trial, the court increased the judgment to $130,875—3% of the REPC sales price. The court also awarded Plaintiffs attorney fees and interest. The court entered a total judgment in the amount of $362,485.96 against Schvaneveldt. Schvaneveldt also moved for a new trial on multiple grounds, including that "[Schvaneveldt] should have been allowed to raise the misconduct of Re/Max and Tim Shea," that "Tim Shea's lawyer violated [Schvaneveldt's] attorney-client privilege," and "cumulative errors." The trial court denied the motion on all grounds.

*Post-trial Litigation Concerning Plaintiff's Standing*

¶24    In the months following trial, Schvaneveldt filed several rule 60(b) motions.[5] Each relied on evidence that, Schvaneveldt argued, showed that the assumed name Re/Max Elite was registered to Dale Quinlan, making him the only person with standing to sue for the FSBO commission. That evidence includes the following:

- documents from the Division showing that Quinlan had registered the assumed name "Re/Max Elite" with himself as the registered agent;

- an affidavit from Quinlan averring that he had no recollection of transferring the assumed name to

---

5. Following Schvaneveldt's lead, we treat them as a single motion for purposes of our analysis.

Aspenwood and that he never transferred to Aspenwood his alleged rights to the FSBO commission earnings;

- an "Expert Forgery Report" opining that it was "highly probable" that the letter requesting the assumed name registration be transferred from Quinlan to Aspenwood was a forgery; and

- a document from the State of Utah showing that the Re/Max Elite assumed name had been re-registered to Quinlan in December 2013 because of the probable forgery.

Combined, the post-trial evidence directly contested the previously uncontested trial testimony of Wing and Shea that Wing, as Re/Max Elite's principal broker, had standing to bring the commission claim on behalf of Plaintiffs.

¶25 Plaintiffs argued that the post-trial evidence should be excluded as untimely. They also presented post-trial evidence of their own in the form of the affidavit of Shane Thorpe, one of the owners of Aspenwood. Thorpe's affidavit averred that Aspenwood, not Quinlan, owned the assumed name; that Quinlan was tasked with registering the assumed name to Aspenwood and making Thorpe the registered agent; and that Quinlan prepared several letters designed to make clear that Aspenwood, not Quinlan, owned the assumed name.

¶26 In addition, while the motions were pending, Quinlan agreed to dismiss Re/Max Elite's claim to the commission and transferred the assumed name Re/Max Elite to Still Standing for $500.

¶27 Schvaneveldt's rule 60(b) motion sought to vacate the judgment on the ground that no named plaintiff had standing to sue for the commission and thus that the court lacked subject matter jurisdiction. Schvaneveldt argued that the post-trial

evidence showed that at all relevant times Quinlan, not Wing, was the registered broker for Aspenwood. Schvaneveldt relied on subparagraphs (4) (void judgment), (5) (discharge of judgment), and (6) (any other reason) of rule 60(b), but not subparagraph (2) (newly discovered evidence).

¶28    The court denied the motion. It cited several grounds for its ruling. First, it ruled that the post-trial evidence was untimely because Schvaneveldt provided no reasons why the evidence could not have been discovered earlier in the litigation. And without the post-trial evidence, standing and jurisdiction were proper. Second, it ruled that Sellers had abandoned their earlier standing challenge once Wing was added as a plaintiff. Third, it ruled that the post-trial evidence at most showed only that the assumed name Re/Max Elite was transferred to Wing a short time after the FSBO and REPC were signed, not that Quinlan did not assign the claims at some other time.

ISSUES

¶29    Schvaneveldt raises three issues on appeal. First, he contends that the trial court erred in denying his rule 60(b) motion based on lack of standing.

¶30    Second, he contends that the trial court erred in granting summary judgment and ruling that Plaintiffs had earned a commission pursuant to the FSBO agreement.

¶31    Third, he contends that "the trial court erred in ruling as a matter of law that any liability of Schvaneveldt was in his personal capacity" and not his representative capacity "as a member of the LLC."

ANALYSIS

I. Standing

A.     Rule 60(b)

¶32     Schvaneveldt contends that the trial court erroneously denied his rule 60(b) motion. The motion argued that Plaintiffs lacked standing to sue for recovery of the sales commission under the FSBO. In Schvaneveldt's view, because the FSBO listed Re/Max Elite as the brokerage, only Re/Max's principal broker could bring an action to recover a sales commission. And, he asserts, although Wing took over as principal broker after Quinlan's departure, "Wing was never assigned any interest in the Re/Max Elite dba, which Quinlan continued to own." According to Schvaneveldt, Quinlan was the only person who could sue for a commission: "In short, the principal broker statute significantly narrows the class of individuals who might seek a real estate commission. The dba statute narrows that class even further, in this case, down to one person: Dale Quinlan."[6] Schvaneveldt contends that "Plaintiffs cannot cure the standing defect . . . because . . . Still Standing Stable has now acquired both the Re/Max Elite dba and all rights of its former owner, Dale Quinlan." Thus, Schvaneveldt argues, "Plaintiffs lack standing to maintain this action against the Defendants."

¶33     Plaintiffs respond that this argument relies on controverted evidence that the trial court properly refused to receive; that in any event, Aspenwood and not Quinlan (who by then had left

---

6. Schvaneveldt does not argue that Wing was not a principal broker in his own right or that Aspenwood was not a legitimate legal entity in its own right. In other words, had Aspenwood signed the FSBO rather than "Re/Max Elite," standing would not be a concern.

the real estate business) contracted with Schvaneveldt; that any pleading problem may be cured by amending the complaint; that if Quinlan held the assumed name, he held it only as an Aspenwood's agent, on behalf of Aspenwood; and that the trial court acted within its discretion in denying Schvaneveldt's rule 60(b) motion.

¶34   "A denial of a motion to vacate a judgment under rule 60(b) is ordinarily reversed only for an abuse of discretion." *Jackson Constr. Co. v. Marrs*, 2004 UT 89, ¶ 8, 100 P.3d 1211 (citation and internal quotation marks omitted). "However, when a motion to vacate a judgment is based on a claim of lack of jurisdiction, the district court has no discretion: if jurisdiction is lacking, the judgment cannot stand without denying due process to the one against whom it runs." *Id.* (citation and internal quotation marks omitted). "Therefore, the propriety of the jurisdictional determination, and hence the decision not to vacate, becomes a question of law upon which we do not defer to the district court." *Id.* (citation and internal quotation marks omitted).

¶35   Rule 60(b) lists various grounds on which the court may relieve a party from a final judgment or order:

> On motion and upon just terms, the court may relieve a party or its legal representative from a judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation or other misconduct of an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon

which it is based has been reversed or vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason that justifies relief.

Utah R. Civ. P. 60(b) (2015).[7] Schvaneveldt requested relief under subparagraph (4), that the judgment was void; subparagraph (5), that the judgment had been released, discharged, or otherwise settled; and subparagraph (6), that the catch-all provision applied.

1.      Rule 60(b)(6)

¶36      Rule 60(b)(6) provides that the court may relieve a party from a judgment for any reason that justifies relief but is not included in subparagraphs (1) through (5). *Id.* R. 60(b)(6). As "the residuary clause of rule 60(b)," subsection (6) embodies three requirements: "First, that the reason be one *other* than those listed in subdivisions (1) through ([5]); second, that the reason justify relief; and third, that the motion be made within a reasonable time." *Laub v. South Central Utah Tel. Ass'n*, 657 P.2d 1304, 1306–07 (Utah 1982). Moreover, rule 60(b)(6) "should be very cautiously and sparingly invoked by the Court only in unusual and exceptional instances." *Id.* at 1307–08 (citation and internal quotation marks omitted).

---

7. We cite to the version of the rule in effect at the time the motion was filed under the principle that we "apply the law as it exists at the time of the event regulated by the law in question. Thus, if a law regulates a breach of contract or a tort, we apply the law as it exists when the alleged breach or tort occurs—i.e., the law that exists at the time of the event giving rise to a cause of action." *State v. Clark*, 2011 UT 23, ¶ 13, 251 P.3d 829. "Similarly, if the law regulates a motion to intervene, we apply the law as it exists at the time the motion is filed." *Id.*

¶37 The trial court rejected Schvaneveldt's subparagraph (6) claim on the ground that "there has not been a proper showing of any separate basis for relief under [subparagraph] (6)." On appeal, Schvaneveldt does not adequately challenge this ruling. He argues cursorily that perhaps Plaintiffs' actions "do not precisely constitute fraud as contemplated under rule 60(b)(3), or do not precisely render the judgment void under rule 60(b)(4), or do not precisely extinguish the judgment under rule 60(b)(5). But they are certainly a basis to vacate the judgment under the equitable principles enumerated under the rule."

¶38 This explanation falls short of demonstrating that the circumstances of this case are so unusual and exceptional that the trial court abused its discretion in rejecting Schvaneveldt's claim under subparagraph (6).

2. Rule 60(b)(5)

¶39 Rule 60(b)(5) provides that the court may relieve a party from a judgment on a showing that "the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or vacated, or it is no longer equitable that the judgment should have prospective application." Utah R. Civ. P. 60(b)(5). The trial court rejected Schvaneveldt's subparagraph (5) claim on the ground that Schvaneveldt had submitted insufficient evidence that Quinlan owned the claim against Schvaneveldt and thus had legal authority to settle or release the judgment. The idea that Quinlan owned the claims against Schvaneveldt was, the court concluded, "a construct" that had only "occurred after trial."

¶40 On appeal, Schvaneveldt argues that subparagraph (5) applies to the current case "where through assignment the claim is extinguished through merger." Schvaneveldt asserts, "It is inequitable to enforce a judgment that no longer applies." As legal support, Schvaneveldt cites *Lamoreaux v. Black Diamond*

*Holdings, LLC*, 2013 UT App 32, ¶¶ 20–22, 296 P.3d 780. Thus, Schvaneveldt argues that it is no longer equitable that the judgment should have prospective application.

¶41 "To begin, the court's power of equity is only to be applied under the rule when highly significant changes alter the landscape of a judgment—for instance, 'subsequent legislation, a change in the decisional law, or a change in the operative facts.'" *Utah Res. Int'l, Inc. v. Mark Techs. Corp.*, 2014 UT 60, ¶ 28, 342 P.3d 779 (quoting 11 Charles Alan Wright & Arthur Miller, *Federal Practice & Procedure* § 2863 (3d ed. 2014) (further footnote material omitted)). "And 'the burden will be high on those seeking relief on this ground as they must demonstrate extraordinary circumstances justifying relief.'" *Id.* (quoting Wright & Miller, § 2863).

¶42 Given the substantial burden facing a movant in cases such as this, we conclude that the trial court did not abuse its discretion in rejecting Schvaneveldt's claim under rule 60(b)(5). Schvaneveldt has not shown that his claim is grounded in equity. He asserts that the only person entitled to sue for the real estate commission on the FSBO is Dale Quinlan. But Quinlan had nothing to do with the FSBO. Even Schvaneveldt does not claim that Quinlan knew about the Property, the transaction, or the FSBO, let alone that Quinlan introduced Buyers to Sellers. Shea, an employee of Aspenwood, contacted Schvaneveldt, signed the FSBO, and introduced Buyers to the Property. True, he wrote "Re/Max Elite" rather than "Aspenwood" on the FSBO. But no evidence, controverted or otherwise, suggests that by doing so Shea intended to name Quinlan rather than Aspenwood as the brokerage. Had he simply listed his employer's legal name rather than what he believed—correctly, Aspenwood argues—to be its assumed name, this issue would never have arisen. It has arisen only because of a claimed filing error with the Division. The issue is thus grounded in a technical legal argument, not equity: Schvaneveldt does not claim that in

fairness, because Quinlan did the work, he should receive the commission. Accordingly, the trial court did not abuse its discretion in denying Schvaneveldt's rule 60(b)(5) motion.[8]

3.      Rule 60(b)(4)

¶43    Rule 60(b)(4) provides that the court may relieve a party from a judgment on a showing that the judgment is void. Utah R. Civ. P. 60(b)(4). The trial court rejected Schvaneveldt's subparagraph (4) claim because it found unpersuasive Schvaneveldt's contention that Quinlan, "has at all times been the real party in interest, and is the only party that has the right to proceed."

¶44    "Normally, the district court's denial of a rule 60(b) motion is reviewed for abuse of discretion." *Migliore v. Livingston Fin., LLC*, 2015 UT 9, ¶ 25, 347 P.3d 394. "But the district court has no discretion with respect to a void judgment because the determination that a judgment is void implicates the court's jurisdiction." *Id.* "Accordingly, the propriety of [the] jurisdictional determination, and hence the decision not to vacate, becomes a question of law upon which we do not defer to the district court." *Id.* (alteration in original) (citation and internal quotation marks omitted).

¶45    However, "we narrowly construe the concept of a void judgment in the interest of finality." *Id.* ¶ 26. A "judgment is

---

8. We recognize that we are affirming on a legal ground that varies somewhat from that articulated by the trial court. A reviewing court may affirm the judgment appealed from "if it is sustainable on any legal ground or theory apparent on the record, even though such ground or theory differs from that stated by the trial court." *Dipoma v. McPhie*, 2001 UT 61, ¶ 18, 29 P.3d 1225 (citation and internal quotation marks omitted).

void under rule 60(b)(4) if the court that rendered it lacked jurisdiction of the subject matter or parties, or the judgment was entered without the notice required by due process." *Id.* (citation and internal quotation marks omitted).

¶46     Schvaneveldt contends that the judgment is void because the trial court lacked subject matter jurisdiction; that the trial court lacked subject matter jurisdiction because Plaintiffs lacked standing to sue for the commission they claimed they earned under the FSBO; that all Plaintiffs lacked standing to sue because none of them were the registered owners of the assumed name "Re/Max Elite," which appears on the FSBO; and that only a registered owner can bring suit under Utah's Assumed Name Statute.

¶47     The Assumed Name Statute prohibits a person or entity who conducts business under an assumed name, without having registered with the Division, from suing in the courts of this state:

> Any person who carries on, conducts, or transacts business under an assumed name without having complied with the provisions of this chapter, and until the provisions of this chapter are complied with:
> > (1) shall not sue, prosecute, or maintain any action, suit, counterclaim, cross complaint, or proceeding in any of the courts of this state; and
> > (2) may be subject to a penalty in the form of a late filing fee determined by the division director in an amount not to exceed three times the fees charged under Section 42-2-7 and established under Section 63J-1-504.

Utah Code Ann. § 42-2-10 (LexisNexis 2014). For reasons explained above, Schvaneveldt maintains that Quinlan, not any of the Plaintiffs, "complied with the provisions of this chapter" to become the registered owner of the assumed name "Re/Max Elite." And he has since transferred that assumed name to Still Standing, so that Plaintiffs cannot cure the flaw in their standing. Thus, according to Schvaneveldt, the trial court lacked subject matter jurisdiction:

> Rule 60(b)(4) provides for relief from a judgment that is void. Standing is a matter of subject matter jurisdiction. A judgment entered by a court that lacks subject matter jurisdiction is not merely voidable. . . . *See Van Der Stappen v. Van Der Stappen*, 815 P.2d 1335 (Utah Ct. App. 1991). Here, the Plaintiffs lacked standing, and thus the court lacked subject matter jurisdiction.

(Parenthetical omitted.)

¶48   Plaintiffs offer several arguments in response. For example, they argue that trial evidence supported a finding that Aspenwood had standing; that the court was entitled to reject evidence presented for the first time nearly a year after trial; that Plaintiffs presented post-trial evidence refuting Schvaneveldt's post-trial evidence; that any failure to comply with the Assumed Name Statute may be cured and in any event did not mislead Schvaneveldt; that any standing defect could have been cured by amending the complaint or reforming the FSBO and REPC; and that public policy does not allow final judgments to be vacated based on untimely evidence.

¶49   We reject Schvaneveldt's contention for a different reason. Schvaneveldt's analysis assumes that failure to comply with the Assumed Name Statute is jurisdictional because it denies a party standing. This assumption, though plausible, is legally incorrect.

¶50 Standing is a threshold "jurisdictional requirement that must be satisfied before a court may entertain a controversy between two parties." *Jones v. Barlow*, 2007 UT 20, ¶ 12, 154 P.3d 808 (citation and internal quotation marks omitted). Under the traditional test for standing, a party must meet three requirements:

> First, the party must assert that it has been or will be adversely affected by the [challenged] actions. Second, the party must allege a causal relationship between the injury to the party, the [challenged] actions and the relief requested. Third, the relief requested must be "substantially likely to redress the injury claimed."

*Hogs R Us v. Town of Fairfield*, 2009 UT 21, ¶ 8, 207 P.3d 1221 (alterations in original) (citation and internal quotation marks omitted).

¶51 "However, standing is not the same as legal capacity to sue." *U.S. Bank, NA v. Kosterman*, 2015 IL App (1st) 133627, ¶ 8, 39 N.E.3d 245 (citation and internal quotation marks omitted). "A plaintiff has *standing* when it is personally aggrieved, regardless of whether it is acting with legal authority; a party has *capacity* when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy." *Nootsie, Ltd. v. Williamson County Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996); *see also Quad Cities Waterkeeper v. Ballegeer*, 84 F. Supp. 3d 848, 858 (C.D. Ill. 2015). Thus, for example, minors, though they may have standing, "have no legal capacity to sue." *Lee v. Gaufin*, 867 P.2d 572, 578 (Utah 1993).

¶52 Here, Schvaneveldt does not challenge Plaintiffs' traditional standing: he does not contest that Shea signed the FSBO; that he acted on behalf of his employer; that Aspenwood employed Shea; or that Shea brought Buyers to the deal, so that

if a commission was in fact due, Shea and Aspenwood, not Quinlan, did the work to earn it. Rather, Schvaneveldt challenges Shea and Aspenwood's *capacity to sue* for the commission under the Assumed Name Statute. Accordingly, the question before us is whether a plaintiff's lack of capacity to sue under the Assumed Name Statute deprives the court of jurisdiction. The answer is that it does not.

¶53 We have held that a plaintiff's failure to comply with the Assumed Name Statute does not render a complaint "a complete nullity so as to deprive the trial court of jurisdiction to consider the motion to amend the complaint." *Graham v. Davis County Solid Waste Mgmt. & Energy Recovery Special Service Dist.*, 1999 UT App 136, ¶ 15, 979 P.2d 363. And we have applied that principle in this very context. In *Shields v. Santana*, 2000 UT App 298U, the defendant contended that (1) the "complaint was void because [the plaintiff] conducted business under an unregistered, assumed name; and (2) the trial court lacked subject matter jurisdiction over his claims pursuant to Utah Code Ann. § 42-2-10 (1999)." *Id.* para. 1. We held that "[t]his fact did not deprive the trial court of subject matter jurisdiction, nor did it make the complaint a nullity on its face." *Id.* We pointed out that the Assumed Name Statute "addresses the capacity to sue, and lack of capacity is an affirmative defense," which may be "waived . . . by failing to bring it before the trial court." *Id.* (citing Utah R. Civ. P. 8(c), 9(a)(1)); *see also Wall Inv. Co. v. Garden Gate Distrib., Inc.*, 593 P.2d 542, 544 (Utah 1979) (stating that a plaintiff's "failure to comply with the assumed name statute does not disqualify it as a plaintiff in this suit").

¶54 Because failure to comply with the Assumed Name Statute affects a plaintiff's capacity to sue, not its standing, the failure is not jurisdictional. Because it is not jurisdictional, it does not render the resulting judgment void. Accordingly, Schvaneveldt's claim in case number 20140978-CA that Plaintiffs

here failed to comply with the Assumed Name Statute does not provide a basis for relief from the judgment under rule 60(b)(4).[9]

¶55   In case 20130746-CA, Schvaneveldt asserts a nearly identical standing argument. But rather than appealing from a specific ruling as in case 20140978-CA, he argues that Plaintiffs lack standing, that standing is jurisdictional, and that subject matter jurisdiction may be raised at any time. We reject that claim for the reasons discussed above: namely, that Plaintiffs' alleged failure to comply with the Assumed Name Statute does not deprive the court of subject matter jurisdiction and thus may not be raised at any time.[10]

## II. The Commission

¶56   Schvaneveldt next contends that "the trial court erred in taking from the jury the question of whether a commission had been earned." This is a challenge to the trial court's ruling that Plaintiffs earned a commission as a matter of law. "An appellate court reviews a trial court's legal conclusions and ultimate grant

---

9. Because the question is not before us, we express no opinion on whether a plaintiff's lack of standing renders a judgment void and thus vulnerable to attack under rule 60(b)(4). We do note that the issue has never been decided in Utah, although it has arisen twice. *See Henshaw v. Estate of King*, 2009 UT App 388U; *Gardiner v. York*, 2010 UT App 108, 233 P.3d 500.

10. Again, we recognize that we are affirming on a legal ground that varies somewhat from that articulated by the trial court. We do so on the principle that a reviewing court may affirm the judgment appealed from "if it is sustainable on any legal ground or theory apparent on the record, even though such ground or theory differs from that stated by the trial court." *Dipoma*, 2001 UT 61, ¶ 18 (citation and internal quotation marks omitted).

or denial of summary judgment for correctness, and views the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600 (citations and internal quotation marks omitted).

¶57 Schvaneveldt contends that "the trial court erred in taking from the jury the question of whether a commission had been earned." Schvaneveldt advances three arguments in support of this contention. First, he argues that Plaintiffs were "required to show seller default under the FSBO." Second, he argues that "[t]here was no basis upon which the trial court could find 'default of the seller' as a matter of law." Lastly, he argues that if Plaintiffs needed to show only that they had procured a "ready, willing, able, and accepted" buyer, issues of fact precluded summary judgment.

¶58 Plaintiffs respond that "the trial court correctly ruled that a commission had been earned." Plaintiffs advance five arguments in support of their position. First, they argue that Schvaneveldt "became obligated to pay a commission the moment he accepted an offer to purchase the property." Second, they argue that the broker's commission "did not depend on the Buyer's or Sellers' subsequent performance." Third, they argue that no dispute exists regarding whether Schvaneveldt accepted an offer. Fourth, they argue that Schvaneveldt's "default caused the transaction to fail." And finally, they argue that Buyers were "ready, willing, and able to purchase the property."

¶59 The trial court concluded as a matter of law that Plaintiffs had earned a commission. First, the trial court ruled that Plaintiffs earned the commission because Sellers accepted the Buyers offer. The court further referred to its previous ruling that the sale failed because Sellers failed to provide insurable access by means of a general warranty deed or a special warranty deed with guaranteed access:

[I]t is undisputed that the lack of a guaranteed access was the sole reason . . . that the transaction failed. . . . [I]t strains credulity to think that somebody would fork over four million [dollars] without a general warranty deed or at least some kind of a guarantee under a special warranty deed that there would be an access.

¶60 The general rule in Utah is that "a real estate broker is entitled to its commission when it has procured a buyer who is ready, willing and able and who is accepted by the seller." *Fairbourn Comm., Inc. v. American Housing Partners, Inc.*, 2004 UT 54, ¶ 7, 94 P.3d 292 (citation and internal quotation marks omitted). However, the parties are free to establish a different rule by contract. *Id.* ¶ 8. Accordingly, we begin our analysis with the contract at issue: the FSBO.

¶61 The FSBO's brokerage-fee paragraph contains at least three terms relevant to the question of whether a fee was earned. The first requires a seller to accept an offer from a named buyer, the second specifies when the fee is "due and payable," and the third provides that if the seller defaults the fee is immediately due and payable:

> 2. BROKERAGE FEE. The Seller agrees to pay the Company, irrespective of agency relationship(s), as compensation for services, a Brokerage Fee in the amount of $____ or 3% of the acquisition price of the Property, if the Seller accepts an offer from Emmett Warren and or Assigns (the "Buyer"), or anyone acting on the Buyer's behalf, to purchase or exchange the Property. The Seller agrees that the Brokerage Fee shall be due and payable, from the proceeds of the Seller, on the date of recording of closing documents for the purchase or exchange of the Property by the Buyer or anyone acting on the

> Buyer's behalf. *If the sale or exchange is prevented by default of the Seller, the Brokerage Fee shall immediately be due and payable to the Company.*

(Emphasis added.) The parties disagree about whether, absent seller default, the sale must close to trigger the brokerage-fee provision. But the final sentence quoted above makes clear that a commission was owed if Sellers defaulted on the REPC.

¶62    As stated above, the court ruled that Sellers breached the REPC by failing to provide "a general warranty deed or at least some kind of a guarantee under a special warranty deed that there would be an access." Paragraph 10.1 of the REPC provides that Sellers "will convey good and marketable title to Buyer at Closing by general warranty deed." Again, the parties agree that Sellers had informed Buyers that they would not be conveying title by general warranty deed.[11]

¶63    That Sellers refused to convey title by general warranty deed when the REPC required a general warranty deed would seem to resolve the breach question. But in his opening brief Schvaneveldt argues that he "had proposed a special warranty deed, and Buyers had stated a willingness to accept it." However, the record shows that Buyers' willingness to accept

---

11. The difference between a special warranty deed and a general warranty deed "is that grantors of special warranty deeds 'only promise that no title defects have arisen or will arise due to the acts or omissions of the grantor,' whereas grantors of general warranty deeds promise to defend 'all claims.'" *Mason v. Loveless*, 2001 UT App 145, ¶ 12, 24 P.3d 997 (quoting, respectively, David A. Thomas, 11 *Thompson on Real Property*, § 94.07(b)(2)(i), at 81–82 (David A. Thomas ed., Supp.2000) and Richard R. Powell, *Powell on Real Property* § 81A.06(2)(d)(iii), at 81A-122-23) (emphases omitted).

something less than a general warranty deed was conditional. Buyers' attorney testified in his deposition that Sellers' attorney called him "right around the time of closing saying that we want to execute a special warranty deed which doesn't guarantee us access . . . And I said, well, that might be okay if I can get a title policy that's going to guarantee me access, and they wouldn't do that either."[12] We agree with the trial court that this exchange put Sellers on notice that a special warranty deed was not acceptable to Buyers absent additional guarantees that Sellers could not provide.

¶64 In his reply brief, Schvaneveldt takes another run at the warranty deed issue. He argues that "a general warranty deed was not required in order to furnish marketable title." That may be true, but the REPC required conveyance by general warranty deed. Schvaneveldt then argues that "the court did not rule that failure to provide a general warranty deed was a seller breach." But as quoted above, the court identified Sellers' failure to provide a general warranty deed as a reason the sale failed. Although the trial court focused on lack of access, that lack of access apparently motivated Sellers' refusal to convey the Property by general warranty deed, and that refusal breached the REPC. Finally, Schvaneveldt argues that "buyers had waived the general warranty deed condition." But, as explained above, the waiver was conditional, and Sellers could not satisfy the condition. No title insurance company—including one hired by Sellers—was willing to insure access to the property.[13]

---

12. In the trial court proceedings, Sellers did not dispute the factual accuracy of this exchange.

13. Sellers had prior notice from SITLA that the Property did not have access from a public road. *See Still Standing Stable, LLC v. Allen*, 2005 UT 46, ¶¶ 2, 5, 122 P.3d 556. Despite this notice, Sellers still claimed in their seller disclosures—incorporated into

(continued…)

¶65  Of course, Sellers might have rendered the condition moot by agreeing to convey title by general warranty deed as required by the REPC. By not doing so, they defaulted under the REPC. That default triggered the commission provision of the FSBO, causing the brokerage commission to be "immediately . . . due and payable." We thus affirm the trial court on this issue.[14]

---

(…continued)

the REPC—that access existed to the Property. *See supra* note 2. Thus, even if Sellers had avoided default by providing Buyers with a general warranty deed, Sellers may have defaulted given their seller disclosure that there was "direct access to the Property through . . . [a] Private Easement"—allegedly, the strip of land that Still Standing had purchased on the opposite side of the closest public road. However, despite Sellers' repeated claims that access exists, the Utah Supreme Court found no access and at least two separate title insurance companies—including one hired by Sellers—had examined the Property and none had been willing to insure access.

14. Schvaneveldt argued in his reply brief and in oral argument that "Plaintiffs did not contend that failure to provide a general warranty deed was the basis for seller default"; that "the court didn't attempt to rule on that"; that there was "no opportunity for trial counsel in this case to oppose it or defend against it" by, for example, submitting a declaration from Schvaneveldt's real estate counsel; and that "they can't just spring that on appeal." That is not how we read the record.

During the summary judgment hearing, Plaintiffs' counsel stated as an undisputed fact that "the REPC said [Sellers] will convey title by a general warranty deed and they wouldn't convey title by a general warranty deed, they kept saying they were going to use a special [warranty] deed and that

(continued…)

III. Schvaneveldt's Personal Liability

¶66     Finally, Schvaneveldt contends that "the trial court erred in ruling as a matter of law that any liability of Schvaneveldt was in his personal capacity."

¶67     We are hampered in our review of this claim of error because, as Plaintiffs observe, "it is unclear which ruling or rulings Schvaneveldt is appealing." Schvaneveldt's brief states

---

(…continued)

was a red flag to the buyers." Plaintiffs' counsel argued that this fact alone "would be sufficient for summary judgment." Furthermore, in questioning Schvaneveldt's counsel, the court asked whether it was "the prerogative of a buyer to spurn a special warranty deed if he feels insecure and say, the only condition to purchasing this property is a general warranty deed?" Schvaneveldt's counsel responded, "Yeah, . . . he could say that, yes." The court replied, "And didn't he do that?" Thereupon, the court and counsel discussed the exchange between Buyers' attorney and Sellers' attorney concerning the general and special warranty deeds. Schvaneveldt's counsel did not claim to be surprised by this line of argument or request the opportunity to supplement the record with a declaration from Schvaneveldt's real estate counsel, but argued the point on the basis of the undisputed record as it then existed. He stated his belief "that [the] proposed switch to those deeds is irrelevant." But Plaintiffs' counsel persisted: "Concerning the warranty deed, the REPC clearly states in Paragraph 10 that the buyer agrees that they will provide a warranty deed, [a] general warranty deed." And, as quoted in the text, the trial court relied explicitly on the general warranty deed requirement in its ruling. In sum, the claim that Sellers breached the REPC by refusing to provide a general warranty deed was in play at the trial court and thus is fair game on appeal.

that the trial court "erred in denying [his] motion for summary judgment on this ground," but his argument does not identify in the record the ruling he challenges. *See* Utah R. App. P. 24(a)(9). Plaintiffs suggest that "it appears that [Schvaneveldt] is appealing the trial court's order dated August 13, 2010." We proceed on that assumption and reject as inadequately briefed any challenge to any other ruling.

¶68 The August 13, 2010 ruling of the trial court denied Schvaneveldt's motion for summary judgment. That motion had sought dismissal of all claims against Schvaneveldt and Code individually. The court observed that the FSBO "identifies '[Charles Schvaneveldt] and Cathy Code' as the seller and provides that the seller will pay a commission fee to Re/Max Elite. The agreement does not indicate that these individuals were acting in a representative capacity." The court therefore concluded that Plaintiffs had "presented sufficient evidence that Mr. Schvaneveldt and Ms. Code are personally liable to withstand a motion for summary judgment." "An appellate court reviews a trial court's legal conclusions and ultimate grant or denial of summary judgment for correctness, and views the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600 (citations and internal quotation marks omitted).

¶69 The Utah Revised Limited Liability Company Act indicates that "no organizer, member, manager, or employee of a company is personally liable . . . for a debt, obligation, or liability of the company." Utah Code Ann. § 48–2c–601 (LexisNexis 2007). However, "where an agent has signed a contract in a personal capacity, that is, executed it in a manner clearly indicating that the liability is his alone . . . he must fulfill." *Daines v. Vincent*, 2008 UT 51, ¶ 40, 190 P.3d 1269 (alteration in original) (citation and internal quotation marks omitted).

¶70   And "it is generally agreed that the determination of the liability of the signer depends upon the construction of a written contract." *Starley v. Deseret Foods Corp.*, 74 P.2d 1221, 1223 (Utah 1938) (citation and internal quotation marks omitted); *see also Daines*, 2008 UT 51, ¶ 40; *Orlob v. Wasatch Mgmt.*, 2001 UT App 287, ¶ 10, 33 P.3d 1078.[15] An agent "can be held personally liable for a signed contract only if he executed the contract 'in a manner clearly indicating that the liability was his alone.'" *Daines*, 2008 UT 51, ¶ 40 (quoting *Starley*, 74 P.2d at 1223). However, "for an agent to be relieved from personal liability upon a negotiable instrument executed by him within the scope of his authority, he must not only name his principal but must express by some form of words that the writing is the act of the principal, although done by the hand of the agent." *Starley*, 74 P.2d at 1223 (citation and internal quotation marks omitted).

¶71   Here, Plaintiffs base their claim for a commission on the FSBO. The FSBO does not express by any form of words that the writing is the act of Schvaneveldt's principal, Still Standing. In fact, the FSBO does not mention Still Standing. Based on these facts alone, we cannot say that the trial court erred in rejecting Schvaneveldt's claim that, as a matter of law, only Still Standing, and not Schvaneveldt, was obligated by the FSBO to pay any commission found to be owing.

¶72   Schvaneveldt argues that "the facts and law show that [he] was acting as a member of the LLC," even though he was listed on the FSBO as a seller. His argument relies on the REPC, which identifies "the property" as "Land LLC Still Standing

---

15. In *Starley* the principal was a corporation, but our supreme court has (as noted above) applied *Starley* to a case where the principal was a limited liability company. *See Daines v. Vincent*, 2008 UT 51, ¶ 40, 190 P.2d 1269 (citing *Starley v. Deseret Foods Corp.*, 74 P.2d 1221, 1223 (Utah 1938)).

Stables," and the seller disclosure form, which identifies the property owner as "Still Standing Stables, LLC." Schvaneveldt also argues that the word "member" originally followed his signature on the REPC.

¶73    None of this evidence undermines the trial court's ruling. Plaintiffs are suing to enforce the FSBO, so it—not the REPC—is the operative document. Furthermore, the REPC does not list Still Standing as the seller, nor do the words "Still Standing Stable" appear anywhere near Schvaneveldt's signature on the REPC. The REPC does state that if the buyer or seller is an entity, "the person executing this Contract on its behalf warrants his or her authority to do so and to bind Buyer and Seller." This term might suggest that Schvaneveldt signed in his representative capacity if the REPC named an entity as the seller, but it does not. The Sellers' disclosure statement does name Still Standing as the seller, but Schvaneveldt's signature does not purport to be in a representative capacity, and the name of the LLC does not appear anywhere near his signature in the disclosure statement.[16]

## IV. Attorney Fees on Appeal

¶74    Plaintiffs request an award of attorney fees on appeal on the ground that the FSBO awards attorney fees to the prevailing party. When under a contractual fee provision "a party is entitled to attorney fees below and prevails on appeal, that party is also entitled to fees reasonably incurred on appeal." *Utah*

---

16. Schvaneveldt also argues, "Alternatively, Schvaneveldt's tort claims against Shea and Wing should be reinstated." However, because these tort claims (negligence and breach of fiduciary duties) are the subject of a separate case—20130768-CA—and are only addressed in two pages in Schvaneveldt's brief in this case, they are addressed in that opinion. *See Wing v. Still Standing Stable LLC*, 2016 UT App 229.

*Transit Auth. v. Greyhound Lines, Inc.*, 2015 UT 53, ¶ 64, 355 P.3d 947. Plaintiffs received attorney fees below and have prevailed on appeal. Accordingly, we award Plaintiffs their reasonable fees incurred in connection with this appeal in an amount to be determined by the trial court.

## CONCLUSION

¶75    For the foregoing reasons, the judgment of the trial court is affirmed and the case remanded for a determination of Plaintiffs' reasonable attorney fees incurred on appeal.

_____