2023 UT App 12

# THE UTAH COURT OF APPEALS

NORTHERN SAN JUAN COUNTY COALITION,
Appellant and Cross-appellee,
*v.*
SAN JUAN COUNTY,
Appellee,

LOVE'S TRAVEL STOPS & COUNTRY STORES,
Intervenor, Appellee, and Cross-appellant.

Opinion
No. 20210235-CA
Filed February 2, 2023

Seventh District Court, Monticello Department
The Honorable Don Torgerson
No. 200700010

Matthew A. Steward and Shaunda L. McNeill,
Attorneys for Appellant and Cross-appellee

Barton H. Kunz II, Alex J. Goble, and Kendall G.
Laws, Attorneys for Appellee

Matthew J. Ball and Jeffery A. Balls, Attorneys for
Intervenor, Appellee, and Cross-appellant

SENIOR JUDGE KATE APPLEBY authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN D. TENNEY concurred.[1]

APPLEBY, Senior Judge:

¶1      The Northern San Juan County Coalition (the Coalition)
appeals the district court's dismissal of its petition for review. The
district court determined that it did not have subject matter

---

1. Senior Judge Kate Appleby sat by special assignment as
authorized by law. *See generally* Utah R. Jud. Admin. 11-201(7).

jurisdiction to hear the petition because of the Coalition's failure to exhaust its administrative remedies in its challenge to a land use decision by San Juan County (the County) approving a planned travel stop of Love's Travel Stops & Country Stores (Love's). In response, Love's cross-appeals the district court's preliminary determination that the Coalition had standing to file its petition. We affirm the court's decision as it relates to the cross-appeal but reverse its decision on each of the points raised by the Coalition's appeal.

BACKGROUND

¶2 Because of increased development in Spanish Valley (in northern San Juan County), the County retained a community planning firm to create a new area plan, and the plan was adopted in April 2018. As new zoning ordinances were created to implement the plan, the planning commission considered a possible development moratorium. The moratorium was first proposed on April 16, 2019, but its adoption was postponed as the result of a county official's request and other procedural delays.

¶3 Love's, having been alerted to the impending moratorium, submitted a sketch plan application for a commercial development on May 3, 2019. The proposed development was a travel center on approximately thirteen acres of land, including a convenience store, a drive-through fast food restaurant, gas pumps, ninety automobile parking spaces, and fifty-three truck parking spaces. The County responded on May 10 (the May 10 Letter), acknowledging receipt of the application and stating, "Under San Juan County's code, this proposal is for a commercial development in a commercial zone so there is nothing additional that Love's needs to do at this time."

¶4 Before Love's plan was approved, there was "active community involvement" and "substantial public clamor about the possibility of a Travel Stop in Spanish Valley." The Coalition

emerged in this milieu when, on March 23, 2019, Carolyn Dailey, a community member, sent an email to neighbors and other community members announcing the Coalition's formation, with the purpose "to have our voice heard in our county government." The Coalition held its first meeting in early April and continued to meet regularly. On May 21, the County held a commissioners' meeting at which Dailey spoke on the Coalition's behalf in support of the proposed development moratorium. Dailey also spoke out against "a Love's truck stop with 53 diesel truck parking slots to be built within 25 feet of residential neighborhoods." The County thereafter adopted the moratorium at this meeting.

¶5    On June 6, Dailey emailed the interim county administrator, asking whether Love's would be subject to the moratorium and asking, "We would also like to know whether Love's was able to get applications, fees, etc[.] rushed through the process to be issued a permit before the Moratorium deadline— or tell me who to contact to get that information?" The following day, June 7, the administrator responded,

> According to the County Planning and Zoning staff, [Love's] applied for the permit to have the truck stop there and they engaged in substantial activities in anticipation of the development long before the moratorium was in place (I found references to the truck stop in news articles published in March). So they're likely vested in that sense.
>
> The San Juan County zoning code . . . reads so permissively that it is tough to see how that kind of use would not be permitted there with the current zoning language.
>
> I think the best person to talk with is probably Brian Torgerson with [the Utah School and Institutional Trust Lands Administration] at this

point, but I will continue to learn about the situation
as well.

¶6    This response prompted Jeannie Bondio, another Coalition member, to file a request with the County pursuant to the Government Records Access and Management Act (the GRAMA Request). Bondio filed her request on June 11 and asked the County to provide any permit applications submitted by Love's, any County determination or evaluation of such applications, any fees paid, and all communications between the County and Love's regarding the proposed travel stop.

¶7    The County responded to the GRAMA Request on June 26. Although the response did not provide all documents requested, it produced Love's sketch plan application and the May 10 Letter. This was the first date upon which the Coalition had actual notice of any approval expressed by the County.

¶8    Ten days later, on July 6, Bondio sent a letter (the Bondio Letter) to the San Juan County Commission (the Commission) following up on the GRAMA Request. She first addressed the dearth of records she received in response to her broad request. She then specifically referenced zoning ordinances with which Love's sketch plan application failed to comply. She concluded her letter with a request that the Commission "investigate this matter immediately[] and issue a decision" as to whether Love's sketch plan had been determined to be in compliance with existing zoning ordinances and whether the application was "deemed complete."

¶9    After months with no response from the Commission, the Coalition retained counsel and sent a letter to the Commission on December 16, asking it to hold a hearing to address the issues raised in the Bondio Letter. Upon further prompting, the County eventually responded to counsel on March 13, 2020, explaining that the Commission would not hold a hearing on the matter

because the Coalition had failed to appeal within ten days of the May 10 Letter.

¶10   The Coalition petitioned the Seventh District Court, seeking review of the matter. Upon the County's request, Love's was joined as a necessary party to the action. Eventually, the Coalition and the County filed cross-motions for summary judgment, with the Coalition arguing that the undisputed facts showed the County did not follow the law in approving Love's plan and the County arguing, in part, that the Coalition lacked standing because it did not exhaust its administrative remedies. Around this same time, Love's filed a motion to dismiss, also arguing that the Coalition failed to exhaust its administrative remedies and additionally asserting that the Coalition lacked associational standing.

¶11   After a hearing, the district court granted the County's motion for summary judgment and Love's motion to dismiss. The court determined that the Coalition had associational standing to bring its claims but had not exhausted its administrative remedies because (1) the Coalition could not rely on the Bondio Letter as an appeal on its behalf since it was not sent in a representative capacity, (2) the Bondio Letter was not an appeal in any event, and (3) the Bondio Letter was untimely. The court therefore concluded that it lacked subject matter jurisdiction. The Coalition now appeals each of the determinations regarding the exhaustion of administrative remedies, and Love's cross-appeals, challenging the court's determination as to associational standing.

ISSUES AND STANDARDS OF REVIEW

¶12   The Coalition challenges several aspects of the district court's dismissal of its claims, specifically, those determinations as to the exhaustion of administrative remedies. "Whether a court lacks subject matter jurisdiction due to a party's failure to exhaust administrative remedies is a question of law, reviewed for

correctness." *Republic Outdoor Advert., LC v. Utah Dep't of Transp.*, 2011 UT App 198, ¶ 12, 258 P.3d 619 (quotation simplified).

¶13 Love's challenges the district court's determination as it relates to whether the Coalition had associational standing to pursue its claims. "When evaluating standing at the motion-to-dismiss stage, the question of standing is primarily a question of law, which we review for correctness." *In re John Edward Phillips Family Living Trust*, 2022 UT App 12, ¶ 22, 505 P.3d 1127 (quotation simplified).

ANALYSIS

I. Exhaustion of Administrative Remedies

A.     Representative Capacity

¶14 The district court determined that the Coalition did not exhaust its administrative remedies because it could not rely on the Bondio Letter as an appeal to the Commission. The court, citing Utah's assumed name statute, reasoned that this was so because "at the time of the Bondio Letter, the Coalition was not authorized by Utah law to transact any business as an association and could not designate an agent." The court also determined that the Bondio Letter was not an appeal by the Coalition because it "did not transact business in the name of the Coalition" and because "an undisclosed agency relationship does not meet the Zoning Ordinance's requirement that the person affected file the appeal." The Coalition argues that the assumed name statute did not prevent Bondio from acting as an agent when she sent the letter and that she did not need to disclose her agency relationship to act on behalf of the Coalition. We agree.

¶15 Utah's assumed name statute provides that "[a] person who carries on, conducts, or transacts business in this state under an assumed name, whether that business is carried on, conducted, or transacted as an individual, association, partnership,

corporation, or otherwise," shall file a certificate with the State within thirty days "after the time of commencing to carry on, conduct, or transact the business." Utah Code § 42-2-5(2), (3). Although the Coalition filed a certificate to satisfy this statute before it filed its petition in the district court, it had not done so at the time the Bondio Letter was sent to the Commission. The Coalition argues that this failure has no effect on whether Bondio and other Coalition members could act as agents for the Coalition. Love's responds that the Coalition's interpretation "would render the statute meaningless by making compliance with a purportedly mandatory statute entirely voluntary (and depriving Utah's citizens of the protection the statute is obviously intended to provide)." We disagree.

¶16 The assumed name statute "is primarily for the convenience of the public rather than protection of the public." *Platt v. Locke*, 358 P.2d 95, 98 (Utah 1961) (quotation simplified). The penalties for noncompliance with the statute are identified as (1) a prohibition of maintaining any action in the Utah courts and (2) a possible assessment of a late filing fee. *See* Utah Code § 42-2-10. Although failure to comply with the statute prohibits an aggrieved party from maintaining an action in court, it does not prohibit such a party from challenging a land use decision with the appropriate local appeal authority. And "it is generally recognized that the legislature in passing [the assumed name statute] did not intend, in addition to subjecting the offender to an express penalty, also to impose the additional penalty of refusing [the offender] any relief on the contract or transactions entered into without compliance with the statute." *Platt*, 358 P.2d at 98 (quotation simplified); *see also Fillmore Products, Inc. v. Western States Paving, Inc.*, 561 P.2d 687, 689 (Utah 1977) ("This court has not applied the general rule of denying relief to unlicensed persons . . . inflexibly or too broadly."); *cf. Olsen v. Reese*, 200 P.2d 733, 736 (Utah 1948) ("The authorities are fairly uniform to the effect that failure to obtain a license which is required by a statute enacted solely for revenue purposes does not render contracts made by the offending party void. On the other hand, contracts

made by an unlicensed contractor when in violation of a statute passed for the protection of the public are held to be void and unenforceable."). Thus, although the Coalition could not, at the time the Bondio Letter was sent, maintain an action *in court*, it could (and did) appeal *to the Commission*.

¶17    Furthermore, even when an entity fails to timely file the required certificate, our case law is clear that such oversight can be cured upon filing. *See Wall Inv. Co. v. Garden Gate Distrib., Inc.*, 593 P.2d 542, 544 (Utah 1979) ("[The plaintiff]'s *early* failure to comply with the assumed name statute does not disqualify it as a plaintiff in this suit. The only sanction associated with non-compliance is denial of the non-complying entity's access to the courts, and that sanction is removed on compliance." (emphasis added)); *Elite Legacy Corp. v. Schvaneveldt*, 2016 UT App 228, ¶ 53, 391 P.3d 222 (relying on precedent where an entity "conducted business under an unregistered, assumed name" and where we held that this fact did not "make the complaint a nullity on its face" (quotation simplified)); *Graham v. Davis County Solid Waste Mgmt. & Energy Recovery Special Service Dist.*, 1999 UT App 136, ¶ 15, 979 P.2d 363 (determining that an unincorporated association that had never filed under the assumed name statute "could have cured the deficiencies in the complaint by filing"). Thus, the interpretation advanced by Love's is far too restrictive.

¶18    We now turn to the question of whether Bondio could have been acting on behalf of the Coalition when her letter used the first-person pronoun "I" instead of "we" and made no reference to the Coalition. An agent can act on behalf of an entity even when the agent "acts in his own name without disclosing his principal," and "this is true even though the third person dealing with the agent did not learn of the existence of the principal until after the [action] was completed." *Garland v. Fleischmann*, 831 P.2d 107, 110 (Utah 1992) (quotation simplified). Thus, the question is not whether the County could discern from the Bondio Letter that it was sent on behalf of the Coalition but, rather, whether it was actually sent on the Coalition's behalf.

¶19 Ample record evidence demonstrates that the Bondio Letter was sent on the Coalition's behalf. First, there is evidence that the GRAMA Request (which the Bondio Letter addressed) was made in a representative capacity. The day after the GRAMA Request was sent, the Coalition held a meeting, the notes from which reflect that "we have made a GRAMA request" and that the results of that request "will determine our strategy." And when the response to the GRAMA Request was received, it was promptly circulated among Coalition members. Next, the Bondio Letter itself was circulated on the Coalition listserv the same morning it was sent to the Commission. Finally, there is evidence that Bondio worked with other members of the Coalition in preparing both the GRAMA Request and the resulting Bondio Letter.

¶20 Thus, because the late filing under the assumed name statute did not prevent the formation of an agency relationship between the Coalition and Bondio, and because there is evidence supporting the Coalition's assertions that Bondio was acting on its behalf when she sent the Bondio Letter, the district court's determination that the Coalition did not file the appeal is erroneous.

B. Requirements of an Appeal

¶21 The relevant county ordinance provides that "any person affected by the land use authority's decision applying a land use ordinance may . . . appeal that decision to the Appeal Authority by alleging there is error in any order, requirement, decision, or determination made by the land use authority in the decision applying the land use ordinance." San Juan County, Utah, Zoning Ordinance § 2-2(2) (2011); *see also* Utah Code § 17-27a-703(1). The district court determined that the Bondio Letter did not identify the land use decision being appealed or an error made by the decision. We disagree.

¶22 The Bondio Letter begins by expressing frustration with the apparent "shell game" going on in relation to the travel stop and the County's reluctance to reveal the truth. In support of this, the letter discusses the GRAMA Request being answered by production of only (1) the sketch plan application and (2) the May 10 Letter stating "there is nothing additional that Love's needs to do at this time." The Bondio Letter notes that no documents were provided showing any determination that Love's application was complete or showing any evaluation of the application. The Bondio Letter goes on to elaborate on two zoning ordinance sections that were not followed according to the information disclosed, concluding that "[t]he 'sketch plan application' Love's submitted on May 3 does not appear to comply with the requirements of the existing San Juan County Zoning Ordinance, specifically sections 12-2 and 12-4," and that the application was therefore not complete before the moratorium became effective. The Bondio Letter's final section, captioned "Conclusion and Request," states,

> The County must comply with its own Zoning Ordinance. I request that the County Commission investigate this matter immediately, and issue a decision as to whether:
>
>     1. Love's 'sketch plan application' has been determined by the County to be in compliance with its existing Zoning Ordinance; and
>
>     2. The Commission considers Love's sketch plan application to be a land use application that has been 'deemed complete' as of the effective date of the Temporary Moratorium Ordinance as well [as] Utah Code 17-27a-5[0]8.

The Bondio Letter concludes, "I look forward to your response soon."

¶23    Thus, the Bondio Letter did mention Love's sketch plan application, the May 10 Letter stating the position that nothing more was required, and the specific ordinances that the County allegedly violated in relation to such a position. And the Bondio Letter asked the Commission to review the matter and "issue a decision" on it. Under the facts of this case, we determine that this was sufficient to constitute an appeal under the appeal ordinance. *See* San Juan County, Utah, Zoning Ordinance § 2-2(2) (2011).

¶24    Both Love's and the County find fault with the Bondio Letter's failure to specifically include the word "appeal" or to request a hearing. But they provide no authority indicating that those specific words are required.[2] And to the extent that the Bondio Letter was not more specific in singling out the May 10 Letter as the County's erroneous decision, that is largely the result of its expressed (and understandable) uncertainty that the May 10 Letter—hardly the paradigm of clarity itself—was intended to function as a land use decision. Nonetheless, the Bondio Letter raised the May 10 Letter's language that nothing more was required and argued against that proposition, pointing to the specific ordinances that it argued would render such a position erroneous, and asked the Commission to investigate and "issue a decision" on the matter. Thus, the Bondio Letter clearly challenged the assertion of the May 10 Letter.

¶25    In sum, because the Bondio Letter referred to the May 10 Letter and specified which ordinances were inconsistent with the position expressed therein, the Bondio Letter met the requirements for an appeal under the related ordinances.

---

2. Love's also argues that because the Bondio Letter was submitted via email to the county administrator, it does not satisfy the requirement that an appeal "must be filed in writing to the County Administrator," *see* San Juan County, Utah, Zoning Ordinance § 2-2(2)(a) (2011). But this contention is not supported by any authority or reasoned analysis, and we decline to consider it further.

Therefore, the district court's determination to the contrary is erroneous.

C.     Timeliness

¶26     The parties agree that the relevant ordinance requires anyone appealing a land use decision in San Juan County to submit the appeal "within ten (10) calendar days of the issuance of the written decision applying the land use ordinance." San Juan County, Utah, Zoning Ordinance § 2-2(2)(a) (2011). And they recognize that the appeal window does not begin with the issuance of the land use decision but, rather, when the appealing party "receive[s] actual or constructive notice of the issuance of [the land use decision]." *Fox v. Park City*, 2008 UT 85, ¶ 25, 200 P.3d 182.

¶27     The Coalition argues that it was not until the June 26 response to the GRAMA Request that the Coalition received actual notice of the County's May 10 Letter, which is the decision relevant to this case. The Coalition therefore argues that its appeal was timely, having been filed on July 6, just ten days after receipt of the response to the GRAMA Request. Although the Coalition recognizes the concept of constructive notice, it contends that the events relied on by the district court would not have provided earlier constructive notice of the County's decision. We agree.

¶28     The district court concluded that three events gave the Coalition earlier constructive notice of the County's decision. First, the court relied on the "substantial public clamor" about the possibility of the truck stop being approved and the "active community involvement" on the matter, including involvement by members of the Coalition. Second, the court pointed to comments Dailey made during a public meeting on May 21 that referred to specific details from the truck stop project, and the court inferred from these comments that the Coalition knew by

that date that Love's had submitted an application.[3] Third, the court relied on the interim county administrator's June 7 email stating that Love's "had applied for the permit after 'substantial activities in anticipation of the development,' and [was] 'likely vested.'" But we agree with the Coalition that none of these events constituted constructive notice that *a decision* on the application had been made.

¶29 In *Fox v. Park City*, 2008 UT 85, 200 P.3d 182, the Utah Supreme Court discussed the constructive notice that would start running the time to appeal. The supreme court stated, "Generally, if a party does not receive actual notice of the issuance of the permit, the party receives constructive notice that a building permit has been issued when construction begins." *Id.* ¶ 27. But this is not the only way constructive notice can occur. *Id.* For example, "the permit holder may devise some method of his own for ensuring that members of the public will be chargeable with knowledge of the permit and his building intentions, such as posting a visible and informative sign on the property prior to construction." *Id.* (quotation simplified). That is, after a transparent action that would clearly convey to affected parties that a decision has been made, those parties will be chargeable with knowledge of the land use decision. Either way, the permit holder has "the responsibility of providing notice of the permit's *issuance*, whether it be by beginning construction or by some other means." *Id.* ¶ 34 (emphasis added).

¶30 But the events relied upon by the district court were not such actions. They did not clearly put the Coalition on notice that a decision had been made. Unlike the start of construction that would communicate that a building permit must have been acquired, the actions here—public clamor, knowledge of an

---

3. The Coalition does not accept this inference drawn by the court. But because we disagree with the district court's timeliness determination, we need not further address the validity of this inference.

application, and being informed that Love's was "likely" vested as a result of the activities it had taken in anticipation of approval—do not clearly indicate that the County had made a decision. And because the short ten-day appeal period starts running upon receipt of constructive notice, *see id.* ¶ 24, it cannot be the case that alerting a party to events that typically occur *prior* to a land use decision being made qualifies as constructive notice of the subsequent decision itself. Indeed, if we allowed notice of an application's pending or submitted status to constitute constructive notice, it could "effectively strip[] potentially aggrieved parties of their right to appeal." *See id.* This is because whenever a party became aware of an application's existence more than ten days before a county acted on the application, then the ten-day appeals period would have commenced and would have completely run before there even existed any decision to appeal.[4]

¶31    Thus, we do not agree that knowledge of precursor events indicating an impending land use decision is sufficient to constitute constructive notice of the issuance of that land use decision. Instead, the time for the Coalition to file its appeal began to run with receipt of the GRAMA response on June 26, thus making its July 6 appeal timely. The district court's determination to the contrary was erroneous.

---

4. To the extent Love's argues that the June 7 email constitutes not just notice that an application had been filed, but also notice that it had been approved, we disagree. The language of the email is unlike the "visible and informative sign" that the *Fox* court opined would convey constructive notice. *See Fox v. Park City*, 2008 UT 85, ¶ 27, 200 P.3d 182 (quotation simplified). Instead, the language of this email was vague and uncertain, stating only that Love's was "likely vested" and hypothesizing that it was unlikely the proposed use "would not be permitted," and then directing Dailey where to obtain more information. That language clearly suggests that a decision had not yet been made.

II. Associational Standing

¶32 Rule 17(d) of the Utah Rules of Civil Procedure provides, "When two or more persons associated in any business either as a joint-stock company, a partnership or other association, not a corporation, transact such business under a common name, . . . they may sue or be sued by such common name." Utah R. Civ. P. 17(d). Love's contests the district court's determination that the Coalition could appropriately bring suit under this rule, specifically challenging whether the Coalition transacted business, as required by the rule.

¶33 As an initial matter, we agree with the Coalition that Love's defines "transacted business" far too narrowly when it argues that the Coalition did not transact business because it "does not claim to have ever contracted with anyone, acquired or transferred any asset, spent any money or purchased any service." The factors relevant to determine whether an entity has "transacted business" depend heavily on the type of business in which the entity typically engages. So although the factors in a for-profit company likely will include many activities with economic implications, the relevant factors will be different for a non-profit association with other organizational goals.

¶34 For example, in a previous case we determined that "an unincorporated, voluntary environmental watch-dog association" met the requirements of rule 17(d) where it had "act[ed] under a common name for several years *in monitoring and working to improve air quality* in Davis County." *Graham v. Davis County Solid Waste Mgmt. & Energy Recovery Special Service Dist.*, 1999 UT App 136, ¶ 12, 979 P.2d 363 (emphasis added). And even in a case involving a bank—an entity whose business clearly revolved around financial transactions—one factor the court listed as relevant was decidedly non-financial: "how the business holds itself out to the public." *Hebertson v. Willowcreek Plaza*, 895 P.2d 839, 840 (Utah Ct. App. 1995), *aff'd*, 923 P.2d 1389 (Utah 1996).

Thus, more factors are relevant to whether an entity "transacted business" than simply those involving financial transactions.

¶35   In its determination of standing, the district court noted,

> There is evidence in the litigation record that the Coalition has engaged in fundraising efforts. Its efforts have expanded and it is involved with general development in the Spanish Valley. The efforts reflect its stated purpose of community activism and advocacy. And it filed its assumed name designation with the State on the day it filed for judicial review. Considering all of the Coalition's activities by the time this case was filed, the court is persuaded that the Coalition could sue as an association . . . .

Love's takes issue with this conclusion and argues that there was no record evidence supporting the court's observation that the Coalition engaged in fundraising.

¶36   Although there are at least some record references to the Coalition's fundraising, many other facts in the record support the district court's ultimate conclusion that the Coalition had standing to bring its claims. Specifically, there is evidence that the Coalition conducted many activities to transact its business of "hav[ing] our voice heard in our county government," such as holding frequent meetings, recruiting members, "monitoring planning and zoning developments in the County, attending and speaking at County Commission and Planning and Zoning Commission meetings," "organizing [public] letter-writing campaigns, meeting individually with public officials and planning consultants, and engaging with the media on news stories and sending Letters to the Editor." These activities show that the Coalition transacted business under a common name, and they support the district court's standing determination. We

therefore decline to disturb the district court's standing determination.[5]

CONCLUSION

¶37    We disagree with the district court on each aspect of its determination as to the exhaustion of administrative remedies. The Bondio Letter was an adequate, timely filed appeal on the Coalition's behalf. We therefore reverse the court's summary judgment and dismissal, and we remand for further proceedings.

¶38    As to Love's cross-appeal, we agree with the district court that the Coalition had associational standing to pursue its claims on appeal. We therefore decline to disturb this portion of the district court's decision.

─────────

5. The County also argues that there can be "no basis for associational standing" where there exists no single member of the Coalition that both filed an appeal of and was adversely affected by the county's decision. *See generally* Utah Code § 17-27a-801(1)–(2) (requiring an "adversely affected party" to exhaust administrative remedies before challenging a land use decision in district court). But as discussed above, *see supra* Part I.A, the Bondio letter was an appeal on behalf of the Coalition; thus, *the Coalition* filed the appeal. And *the Coalition* also has standing as an adversely affected party because at least one of its members owns property adjoining the land intended for the travel stop. *See* Utah Code § 17-27a-103(2) (including in the definition of "adversely affected party" a person who "owns real property adjoining the property that is the subject of a land use application or land use decision"); *Utah Chapter of Sierra Club v. Utah Air Quality Board*, 2006 UT 74, ¶ 21, 148 P.3d 960 ("An association . . . has standing if its individual members have standing and the participation of the individual members is not necessary to the resolution of the case."). Thus, this argument is not well taken.